**2015-1116, -1119**

_____

**United States Court of Appeals
For the Federal Circuit**

_____

**SHAW INDUSTRIES GROUP, INC.,**

*Appellant,*

**v.**

**AUTOMATED CREEL SYSTEMS, INC.,**

*Cross-Appellant,*

_____

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in
Nos. IPR2013-00132 and IPR2013-00584.

_____

**BRIEF FOR PETITIONER-APPELLANT
SHAW INDUSTRIES GROUP, INC.**

_____

Thad C. Kodish
Erin P. Alper
Fish & Richardson, P.C.
1180 Peachtree Street, N.E., 21st Floor
Atlanta, GA  30309
(404) 892-5005

John A. Dragseth
Fish & Richardson, P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN  55402
(612) 335-5070

January 9, 2015

*Attorneys for Appellant*

## **CERTIFICATE OF INTEREST**

Counsel for the Appellant, Shaw Industries Group, Inc., certifies the following:

1.    The full name of every party represented by me is:

   Shaw Industries Group, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   None

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Berkshire Hathaway, Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   ▪    Fish & Richardson, P.C., Thad C. Kodish, Erin P. Alper, W. Karl Renner, Hyun Jin In, Thomas Rozylowicz, John A. Dragseth


Dated:  January 9, 2015          By:  *s/ Thad C. Kodish*
                                  Thad C. Kodish

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................... ii

TABLE OF AUTHORITIES ............................................................................ v

ABBREVIATIONS .......................................................................................... x

STATEMENT OF RELATED CASES ............................................................. 1

JURISDICTIONAL STATEMENT ................................................................. 1

STATEMENT OF THE ISSUES ...................................................................... 1

STATEMENT OF THE CASE ......................................................................... 2

I.     Overview ................................................................................................ 2

II.    Relevant Facts ....................................................................................... 5

    A. The '360 Patent .................................................................................. 5

    B. The Prior Art ..................................................................................... 10

        1. Munnekehoff ........................................................................... 10

        2. Barmag ..................................................................................... 13

        3. Ligon ........................................................................................ 16

        4. Singer ....................................................................................... 18

        5. Payne ........................................................................................ 19

    C. Procedural History ............................................................................ 22

        1. Shaw's Petition ....................................................................... 22

        2. ACS's Preliminary Response ................................................ 23

        3. The Board's Institution Decision ......................................... 24

        4. ACS's Response ...................................................................... 24

        5. Shaw's Reply Responding to ACS's Inoperability
          and Sharp Turns Arguments ................................................... 25

        6. Oral Hearing ........................................................................... 27

        7. The Board's Final Written Decision ..................................... 28

SUMMARY OF THE ARGUMENT ............................................................... 29

ARGUMENT ............................................................................................ 32

I.     Standard of Review ...................................................................... 32

II.    The '360 Patent is Obvious ........................................................ 33

       A. The Obviousness Analysis ...................................................... 34

       B. The Board's Finding That Combining Munnekehoff
          or Barmag with Ligon Would Result in Inoperability is
          based on Legal Error and Not Supported by Substantial
          Evidence ................................................................................. 34

              1. The obviousness analysis must include consideration
                 of modifications a POSITA would make to the prior art to
                 avoid inoperability ......................................................... 34

              2. The Board's conclusion that a POSITA could not
                 combine the prior art without a "complete redesign" is
                 based on factual error and insubstantial evidence ..................... 37

       C. The Board's finding that Ligon Teaches Away from Combination
          with Munnekehoff or Barmag is based on Legal Error and Not
          Supported by Substantial Evidence ......................................... 45

              1. The Board erred in focusing solely on Ligon's "primary
                 objective" and disregarding other teachings ............................. 45

              2. "Particularly sharp[]," as used in Ligon does not mean
                 "ninety degrees" ............................................................ 48

       D. The Board's Clearly Erred in finding that Shaw's Rebuttal
          Arguments to ACS's Responsive Declaration Constituted Untimely
          New Evidence ......................................................................... 52

III.   THE BOARD ERRED IN REJECTING PAYNE AS REDUNDANT ... 58

       A. This Court has jurisdiction to review the Board's redundancy ruling.... 58

       B. The Redundancy Doctrine's Inception in *Liberty Mutual* ...................... 59

       C. The Board's Redundancy Doctrine is Unlawful .................................... 62

              1. *Chevron* Analysis Applies ............................................ 63

              2. *Chevron* Step 1: Congress has made plain that the
                 Board cannot reject grounds under its Redundancy
                 Doctrine ..................................................................... 64

i. Statutory Context Dispels the Redundancy
Doctrine............................................................................ 65

ii. The Redundancy Doctrine is inconsistent with
the AIA's overall statutory scheme and legislative
history............................................................................... 65

3. *Chevron* Step 2: The Board's application of the
Redundancy Doctrine to exclude the Payne-based ground
from its Final Written Decision is not reasonable. ................... 68

i. The AIA does not laud efficiency over integrity.............. 68

ii. The Board fails to provide reasonable guidance
as to an appropriate number of grounds ......................... 69

iii. The strengths and weaknesses test is unreasonable ....... 71

iv. The Redundancy Doctrine is inconsistent with
the AIA's estoppel provisions........................................ 74

4. The Redundancy Doctrine is Arbitrary and Capricious............. 74

D. Alternatively, Shaw should not be estopped from asserting
invalidity of the '360 Patent based on the Payne-based ground
per section 102 ....................................................................... 75

CONCLUSION ................................................................................ 77

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*ACS v. Shaw*,
    1:12-cv-424-RWS (N.D. Ga.), ECF No. 49 .................................................. 70

*Alcon Research, Ltd. v. Apotex Inc.*,
    687 F.3d 1362 (Fed. Cir. 2012) ............................................................... 45, 47

*Auer v. Robbins*,
    519 U.S. 452 (1997) .................................................................................. 64

*Berk-Tec LLC v. Belden Techs., Inc.*,
    IPR2013-00057, Paper 29 (Sept. 10, 2013) ........................................... 53, 56

*Bowles v. Seminole Rock & Sand Co.*,
    325 U.S. 410 (1945) .................................................................................. 63

*Chevron U.S.A. Inc. v. NRDC, Inc.*,
    467 U.S. 837 (1984) ......................................................................... *passim*

*Consolidated Edison Co. v. NLRB*,
    305 U.S. 197 (1938) .................................................................................. 32

*EMC Corp. v. PersonalWeb Techs., LLC*,
    IPR2013-00087, Paper 5 (Dec. 17, 2012) ................................................ 61

*EMC Corp. v. PersonalWeb Techs., LLC*,
    IPR2013-00087, Paper 16 (May 17, 2013) .............................................. 61

*EMC Corp. v. PersonalWeb Techs., LLC*,
    IPR2013-00087, Paper 25 (June 5, 2013) ........................................... 61, 62

*In re Chevalier*,
    500 Fed. Appx. 932 (Fed. Cir. 2013) ................................................... 40, 43

*In re Cuozzo Speed Techs., LLC*,
    No. 14-1301 (filed Jan. 8, 2014) ........................................................... 1, 61

*In re Etter*,
  756 F.2d 852 (Fed. Cir. 1985) (*en banc*) .................................................54, 55

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ........................................................................................64

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) .....................................................................32

*In re Gurley*,
  27 F.3d at 553 ...................................................................................................45

*In re Icon Health & Fitness, Inc.*,
  496 F.3d 1374 (Fed. Cir. 2007) ......................................................35, 36, 44

*In re Keller*,
  642 F.2d 413 (C.C.P.A. 1981) .......................................................................33

*In re Kotzub*,
  217 F.3d 1365 (Fed. Cir. 2000) .....................................................................32

*In re Mouttet*,
  686 F.3d 1322 (Fed. Cir. 2012) ........................................................33, 34, 54

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ................................................................. 32, 34, 46, 47

*Liberty Mutual Ins. v. Progressive Casualty Ins. Co.*,
  CBM2012-00002, Paper 38 (Sept. 3, 2013); .....................................53, 56, 57

*Liberty Mutual Ins. v. Progressive Casualty Ins. Co.*,
  CBM2012-00003, Paper 7 (Oct. 25, 2012), .......................................59, 60, 70

*Liberty Mutual Ins. v. Progressive Casualty Ins. Co.*,
  CBM2012-00003, Paper 78 (Feb. 11, 2014) .........................................55, 56

*Minkin v. Gibbons, P.C.*,
  680 F.3d 1341 (Fed. Cir. 2012) .....................................................................74

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...........................................................................................74

vi

*Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*,
    669 F.3d 1340 (Fed. Cir. 2012) .......................................................74

*Optivus Tech., Inc. v. Ion Beam Applications S.A.*,
    469 F.3d 978 (Fed. Cir. 2006) .................................................36, 44

*Oracle Corp. v. Clouding IP, LLC*,
    IPR2013-00088, Paper 7 (May 14, 2013)....................................61,

*Oracle Corp. v. Clouding IP, LLC*,
    IPR2013-00088, Paper 13 (June 13, 2013)................................ 61, 62, 70, 73

*Pregis Corp. v. Kappos*,
    700 F.3d 1348 (Fed. Cir. 2012) .......................................................59

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995)...........................................................................64

*St. Jude Med. v. Bd. of Regents of the Univ. of Michigan*,
    IPR2013-00041, Paper 69 (May 1, 2014)........................................5

*Sullivan v. Zebley*,
    493 U.S. 521 (1990).........................................................................63

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
    407 F.3d 1371 (Fed. Cir. 2005) .................................................45, 61

*Versata Dev. Grp., Inc., v. SAP America, Inc.*,
    No. 14-1194 (filed Nov. 13, 2013) ...................................................1

*Vibrant Media, Inc. v. General Electric Co.*,
    IPR2013-00172, Paper 50 (July 28, 2014).   ...........................53, 55

*Wechsler v. Macke Int'l Trade, Inc.*,
    486 F.3d 1286 (Fed. Cir. 2007) .......................................................40

## Statutes

5 U.S.C. § 706............................................................... 33, 58, 63, 74

28 U.S.C § 1295(a)(4)...........................................................................1

35 U.S.C. § 103(a) ................................................................34

35 U.S.C. § 141(c) ..................................................................1

35 U.S.C. § 142 .......................................................................1

35 U.S.C. § 311(b) ................................................................69

35 U.S.C. § 314 ............................................................1, 58, 59

35 U.S.C. § 315(e) .................................................65, 66, 74, 75

35 U.S.C. § 316(b) ..........................................................63, 65

35 U.S.C. § 318(a) ..................................................................1

35 U.S.C. § 319 .....................................................................58

35 U.S.C. § 326(b) .......................................................60, 61, 65

**Other Authorities**

37 C.F.R. § 90.3(a) .................................................................1

37 C.F.R. § 42.1(b) .......................................................60, 63, 68

37 C.F.R. § 42.23 ............................................................52, 57

37 C.F.R. § 42.100(c) ...........................................................62

37 C.F.R. § 42.108 ........................................................24, 62, 63

157 CONG. REC. S1,377 (2011)............................................67

77 Fed. Reg. 48,612 (Aug. 14, 2012) ....................................52

77 Fed. Reg. 48,756 (Aug. 14, 2012) ..............................52, 53

Restatement (Second) of Judgments §§ 27, 28(1), (3)-(4) (1982)......................76

John F. Manning & Matthew C. Stephenson, *Legislation and Regulation* (2nd ed. 2013) ................................................................64

1 Richard J. Pierce, Jr., *Administrative Law Treatise* (5th ed. 2010) .................64

Gary Lawson, *Federal Administrative Law*, 955-60 (6th ed. 2013) ..................59

## **ABBREVIATIONS**

**Parties**

| | |
|---|---|
| Shaw | Appellant Shaw Industries Group, Inc. |
| ACS | Cross-Appellant Automated Creel Services, Inc. |

**Cites**

| | |
|---|---|
| JA__ | Joint Appendix at page(s) __ |

**Terms**

| | |
|---|---|
| The patent | U.S. Patent No. 7,806,360 |
| AIA | Leahy-Smith America Invents Act |
| APA | Administrative Procedure Act |
| the Board | Patent Trial and Appeal Board |
| IPR | *Inter Partes* Review |
| PGR | Post Grant Review |
| POSITA | Person of Ordinary Skill in the Art |
| Munnekehoff | Prior art reference DE 3429153 to Munnekehoff |
| Barmag | Prior art reference DE 7413531 to Barmag |
| Ligon[1] | Prior art reference U.S. Patent No. 5,624,082 to Ligon |
| Payne | Prior art reference U.S. Patent No. 4,515,328 to Payne |
| Singer [2] | Prior art reference U.S. Patent No. 4,545,547 to Singer |
| Interposing Claims | Claims 6, 7, 13, 15-18 and 21 of U.S. Patent No. 7,860,360 |
| Non-Interposing Claims | Claims 1-4, 5, 8-12, 14, 19 and 20 of U.S. Patent No. 7,860,360 |

---

[1] Record also includes reference to another Ligon reference (U.S. Patent No. 5,323,982), which is not relevant on appeal.

[2] Record also includes reference to another Singer reference (U.S. Patent No. 4,836,468), which is not relevant on appeal.

## STATEMENT OF RELATED CASES

Appeals from two IPRs (Nos. IPR2013-00132 and IPR2013-00584) concerning the same patent have been consolidated in the present appeal. Counsel is aware of two cases pending before this Court that may directly affect part of this Court's decision in this appeal. *In re Cuozzo Speed Techs., LLC,* No. 14-1301 (filed Jan. 8, 2014), and *Versata Dev. Grp., Inc., v. SAP America, Inc.*, No. 14-1194 (filed Nov. 13, 2013), both relate, at least in part, to whether 35 U.S.C. §§ 314(d) (*In re Cuozzo*) or 324(e) (*Versata*) limit this Court's jurisdiction over IPR or PGR institution decisions.

## JURISDICTIONAL STATEMENT

This appeal arises from a final written decision of the Board in an IPR proceeding. The Board entered its final written decision pursuant to 35 U.S.C. § 318(a) on July 24, 2014. Shaw timely appealed on September 25, 2014. 35 U.S.C. § 142; 37 C.F.R. § 90.3(a). This Court has jurisdiction under 35 U.S.C. § 141(c) and 28 U.S.C § 1295(a)(4).

## STATEMENT OF THE ISSUES

1.    Did the Board err in finding that the Interposing Claims of the '360 patent are nonobvious based on the combination of Ligon with either Munnekehoff or Barmag, where:

1

a) The Board incorrectly found the proposed combination inoperable, based on an erroneous legal standard and a lack of substantial evidence;

b) The Board incorrectly found that Ligon teaches away from combination with Munnekehoff or Barmag, based on an erroneous legal standard and a lack of substantial evidence;

c) The Board erroneously required Shaw to have included rebuttal expert testimony on operability in its petition instead of in its reply?

2.      Did the Board err in finding redundant the invalidity ground Shaw asserted in its petition based on Payne, where the Board's finding is arbitrary and capricious?

## STATEMENT OF THE CASE

### I.   OVERVIEW

This is an appeal from a final written decision in an IPR, in which the Board found certain claims of the '360 patent (Non-Interposing Claims) anticipated and/or obvious, but found other claims (Interposing Claims) nonobvious, where Shaw appeals this latter finding.  All claims relate to textile manufacturing machines, or "creels," that supply stranded material (*i.e.*, yarn) to a manufacturing process.  The Non-Interposing Claims tie together strands from

2

two spools, or packages, on two separate moveable carts, to provide a
continuous yarn feed to a manufacturing process, while the Interposing Claims
add one or more packages (*i.e.*, "interposing" packages) to this arrangement.

Shaw's petition asserted anticipation of the Interposing Claims by Payne
(ground 11) and obviousness by Ligon with Munnekehoff or Barmag (grounds 3
and 8).  In granting Shaw's petition, the Board denied Shaw's anticipation
ground under Payne as redundant of the obviousness grounds.

ACS admitted in the IPR that Munnekehoff, Barmag, and Ligon disclose
all elements of the Interposing Claims, but disputed whether combining (i)
Munnekehoff with Ligon or (ii) Barmag with Ligon would have been obvious.
Demonstrating obviousness, a POSITA would have been motivated to combine
Munnekehoff or Barmag, each of which disclose two yarn packages
interconnected across moveable creels, with Ligon, which discloses a single cart
with four interconnected yarn packages.  All of these references describe
arrangements that accomplish the well-known concept of increasing continuous
runtime by tying together multiple packages.  While the Board found the Non-
Interposing claims obvious, it found the Interposing Claims nonobvious.

The Board gave two reasons for its nonobviousness decision:  (1)
supposed inoperability of the resulting combinations and (2) Ligon's alleged

teaching away from the combinations.  Both were error.  On the first, the Board failed to consider that a POSITA was not required to bodily incorporate one structure into the other, where a POSITA would have made common sense modifications to the prior art to avoid inoperability.  The Board's inoperability finding was based, not on substantial evidence, but on clear misreading of the record and an erred reliance on ACS's improper eleventh-hour exhibits.  The Board's related finding that Shaw should have presented rebuttal arguments regarding operability in its petition (before ACS had even claimed inoperability) is also in error.

For teaching away, the Board improperly focused solely on Ligon's "primary objective" while disregarding its other teachings, where the law requires consideration of the entirety of the prior art.  Further, the Board's conclusion that Ligon's expressed objective of avoiding "particularly sharp[]" turns meant avoidance of "ninety degree angles" is not based on substantial evidence, but is instead based on a misreading of the record and conclusory statements from the patentee.

The Board additionally erred in finding, in its decision to institute, that Shaw's anticipation ground based on Payne were redundant of the obviousness grounds.  The Board's redundancy conclusion was arbitrary and capricious, as

4

the AIA prohibits the Board's exclusion of the Payne-based ground, and the

Board was unreasonable in its application of its redundancy conclusion to

exclude the Payne-based ground.

On appeal, Shaw contends that: (a) the Board's nonobviousness findings

are based on legal error and not supported by substantial evidence, and should

thus be reversed, and (b) the Board's improper redundancy ruling as to the

Payne-based ground covering the Interposing Claims (ground 11) should be set

aside and remanded, or otherwise hold Shaw not estopped from relying on the

purported redundant grounds in future proceedings.

## II.   RELEVANT FACTS

### A.    The '360 Patent

The '360 patent, filed in 2008, relates to a decades-old concept called

creeling.  A creel supports packages of stranded material, such as yarn, and

feeds it to a processing line in various manufacturing processes (*e.g.*, those

related to making textiles like carpet).  The patent's Figure 12 illustrates the

creel assembly, but not the downstream manufacturing process, in the following

perspective view:



(A144 (in color).)

The patent discusses putting multiple levels of stranded material packages (*e.g.*, spools) on support arms on two moveable carts (or "cartridges") on opposite sides of a stationary frame. The material on these two packages is connected (*i.e.*, tied together) so that when a first package on a first cart supplying the manufacturing process (active package)[3] runs out, the supply switches to a second package on a second cart (ready package). Once the second package is depleted, the process repeats: the supply for the stranded material moves back across the frame to the first package, which has been reloaded and tied to the tail end of the second package in the meantime. If each cart has packages stacked vertically, then multiple feeds of yarn can be

---

[3] A package is "active" when it is being used, and "ready" when awaiting use. Thus this is a fluid characterization.

generated—one for each vertical level.[4]  The original examiner allowed the claims because of the transfer of yarn from one cart to another.  (A93; A243-244.)  In the IPR, Shaw argued, and the Board agreed, that this operation has been known for decades.  (A49 (finding, *e.g.*, claim 1 invalid).)

The patent also discusses a concept it calls "interposing."  Interposing involves adding additional packages to one or both of the carts, where strands from those extra packages are joined with strands from the other packages at the same vertical level to maintain a continuous flow and reduce the frequency of reloading a cart's packages.  (A77 (claims 6 & 7).)  In the primary embodiment, each cart gets one extra package so that there are four packages.  (A74 (8:48-52).)  An overhead view of this primary embodiment is pictured below, with arrows added to show the order in which the packages are depleted:

---

[4] The patent discloses a creel with multiple levels (3), but it does not claim multiple levels.



Fig. 15

(A145 (in color).)  As the patent recognizes, the concept of tying neighboring packages together to increase continuous yarn runtime was known in the prior art.  (A71 (1:66-2:3); A73 (6:52-55).)  Claim 6, reproduced below along with claim 5 from which it depends, is representative of the Interposing Claims:

> A creel magazine for feeding stranded material to a manufacturing process comprising:
>
> a magazine having a stationary magazine frame comprising a common guide for said stranded material;
>
> a first and a second removable cartridge positioned adjacent said magazine frame on respective opposite sides of said magazine frame, said first removable cartridge having at least one support arm supporting an active package of stranded material thereon;
>
> said second removable cartridge having at least one support arm supporting a ready package of stranded material thereon

8

wherein a trailing end of said stranded material carried by said active package is connected to a leading end of said stranded material carried by said ready package; [and]

*an additional support arm supported adjacent to said at least one support arm for supporting an additional ready package on said first removable cartridge, to be selectively interposed between said active package and said ready package on said second removable cartridge to feed said stranded material.*

wherein said common guide is an annular turning surface and said stranded material is sequentially fed to said common guide from said active package then from said ready package.

(A77 (emphasis added for interposing limitation).)

In the preferred embodiment, the stranded material is continuously fed to

the manufacturing process from the packages through a shared or common guide

on each level (*see* annotated Figs. 12 (perspective view) & 13 (overhead view),

below, with yarn feed in red); no yarn extends vertically between levels. (A75

(10:10-16).)



9

In this arrangement, yarn feeds horizontally from the packages (30) to a common guide (70), then vertically through the guide, and then horizontally from the guide out to the manufacturing process (through secondary guide 127). This arrangement—where "a single running length of stranded material is supplied to the manufacturing process for every level of packages" (*id.*) such that no yarn extends between the levels—is not claimed.

### B.    The Prior Art[5]

#### 1.    Munnekehoff

Like the '360 patent, Munnekehoff, filed in 1984, discloses a vertically arranged, multi-level creel that continuously supplies stranded material to a manufacturing process using moveable carts (removable sections 8 and 9) positioned on opposite sides of a stationary frame (stationary column 20), as shown in a side view from Munnekehoff:

---

[5] Other prior art in Shaw's petition may be relevant to the consolidated appeal, and may be addressed in Shaw's yellow brief. (No. 15-1119).



(A269; A271 (claims 2 & 5); A276 (7:2-10); A280 (11:7-11), A288.)  Each

section has at least one support arm that holds a package of stranded material

(bobbins).  (*E.g.,* A271 (claim 4).)  The material on these two bobbins is

connected to feed sequentially from the first bobbin on the first section (stock

bobbin) across the column to the second bobbin on the second section (standby

bobbin) after the first bobbin is depleted.  (A274 (5:1-30); A276 (7:17-27).)

Once the second bobbin is depleted, the process repeats: the stranded material

moves back across the column to the first bobbin, which has been replaced with

11

a full bobbin.  (A274 (5:1-30); A276 (7:17-27).)  One continuous feed of yarn for each level includes two bobbins, one on each section.  Munnekehoff contemplates reconfiguring the bobbins to increase packing density while maintaining an undisturbed yarn path.  (A275-276 (6:34-7:2).)  Munnekehoff discloses the concept of increasing efficiency via continuous runtime.  (A275 (6:21-25); A276 (7:24-27).)

Each level has its own common guide (thread guide 14) through which stranded material feeds.  (A280 (11:7-11); A280 (11:26-32).)  Munnekehoff depicts these guides as tubes—one for each level—extending vertically along the stationary column between levels.  (A280 (11:26-32).)  The thread guides are the guide tubes' circular openings.  (*Id*.)  In this arrangement, yarn is generally fed horizontally from the packages to the tubes, then vertically through the tubes to the top of the creel, and then horizontally again to the manufacturing process, as shown in annotated Fig. 2, below, in red (for the lowest level only).  This last turn is depicted as a ninety-degree turn in Munnekehoff's figures.



FIG.2

### 2. Barmag

Like the '360 patent, Barmag, published in 1975, also discloses a vertically arranged, multi-level creel that continuously supplies stranded material to a manufacturing process through the use of moveable carts (section creel carriages 2 and 3) positioned on opposite sides of a stationary frame (thread guide support carrier 34).

13



**Fig.1**

(A312; A317 at [0013]; A319 at [0020]; A323.)  Each section has at least one

support arm, each holding a package of stranded material (bobbins).  (A317 at

[0014].)  The material on these two bobbins is connected to be sequentially fed

from the first bobbin on the first section (feeding bobbin) across the column to

the second bobbin on the second section (reserve bobbin) after the first bobbin is

depleted. (A319 at [0021].)   Once the second bobbin is depleted, the process

repeats:  the stranded material moves back across the column to the first bobbin,

which has been replaced with a full bobbin.  (A319 at [0022].)  One continuous feed of yarn for each level includes two bobbins, one on each section.  (A319 at [0021].)  Barmag discloses the concept of increasing efficiency via continuous runtime.  (A316 at [0006]-[0007].)

Each level has its own common guide (inlet openings 35-39) through which stranded material feeds.  (A318-319 at [0019].)  Barmag depicts these guides as tubes—one for each level—extending vertically along the thread guide support carrier between levels.  (A317-318 at [0015].)  The inlet openings are the circular openings of the guide tubes.  (*Id*.)  Barmag also contemplates replacing these guide tubes with guide eyelets.  (*Id*.)  In this arrangement, yarn is generally fed horizontally from the packages to the tubes, then vertically through the tubes to the top of the creel, and then horizontally again to the manufacturing process, as shown in annotated Fig. 1, below, in red (for the lowest level only).  These two turns are depicted as ninety-degree turns in Barmag's figures.



Fig.1

### 3.    Ligon

Whereas no one disputes that Munnekehoff and Barmag disclose connecting two packages on separate carts to achieve continuous runtime, Ligon shows the concept of tying four packages together was also well-known in the prior art.  Ligon, filed in 1995, discloses a multi-level creel that continuously supplies stranded material to a manufacturing process.  (A352 (Cover).)  Ligon uses creel units mounted on adjustable frames as opposed to moveable carts.  (A351 (Abstract); A357 (2:32-47).)  Yarn is generally fed

16

horizontally from the creel units through a common guide to the manufacturing process.  (A357-358 (2:64-3:8).)  As part of this horizontal arrangement, Ligon avoids "yarn chang[ing] its direction[] particularly sharply."  (A357 (1:36-39).) Ligon does not define a "particularly sharp[]" turn.  (*Id*.)



(A356.)

Each creel unit has two pairs of neighboring packages, with each pair mounted on a separate frame, for a total of four packages per creel unit.  (A357

(2:5-31).)  In one embodiment, all four packages are interconnected so that yarn passes from the *first* and *second* packages on the first frame to the *third* and *fourth* packages on the second frame before moving back across to the first frame to repeat the process.  (A357 (2:48-63).)

Ligon discloses that tying two packages together to provide continuous yarn feed was well known in various arrangements (including neighboring packages (A357 (1:19-24)), as was tying four packages together to further increase runtime.  (A357 (1:25-28) ("With the advent of higher speed looms . . . creels with arrangements of four yarn packages tied together have been provided.").)  Ligon cites Singer as an example of a four-package arrangement.  (A357 (1:28-31).)  Ligon discloses adaptability between two- and four-package arrangements.  (A358 (3:17-19, 3:47-49).)  Ligon discloses the concept of increasing efficiency via continuous runtime.  (A357 (1:20-24).)

### 4.    Singer

Singer provides another example of a four-package arrangement in the prior art, but in a vertical arrangement and with no criticism of "sharp turns." (*See, e.g.,* A812-14 (Figs. 2, 4 & 5).)

18



Singer also discloses the concept of increasing efficiency via continuous

runtime.  (A815 (2:29-30); A816 (3:6-8).)

### 5.    Payne

Payne is a 102 reference, disclosing both tying together packages on

separate carts *and* doing so in a four-package arrangement.  Like the '360 patent

(and Munnekehoff and Barmag), Payne, filed in 1983, also discloses a vertically

arranged, multi-level creel that continuously supplies stranded material to a

manufacturing process through use of moveable carts (modules 10, 110, 210)

positioned on opposite sides of a stationary frame (members 17 & 27).  (A328

(Abstract); A341-342 (8:63-9:46).)  Each module (pictured below from Figure

1) has at least one support arm (12), each holding a package of stranded material

(13).  (A339 (3:66-4:15).)

19



(A328.)  Like the '360 patent, Payne explicitly discloses and depicts

interconnecting four packages—two on each module—across the stationary

frame.  (A331, A341-342 (8:63-9:46).)



20

Each level has its own common guide (individual yarn guides 31) through which stranded material is fed.  (A339-340 (4:65-5:5).)  Like Munnekehoff and Barmag, the stranded material from each level is fed through its respective common guide (31) to the manufacturing process after traveling vertically through other levels, as seen in annotated figure 2 (A330), below, in red.



Payne also discloses the concept of increasing efficiency via continuous runtime.  (A328 (Abstract); A338 (2:9-13, 2:63-65).)

### C.    Procedural History

#### 1.    Shaw's Petition

Shaw filed its IPR petition on February 1, 2013 alleging all claims were invalid.[6]

For the Interposing Claims, Shaw argued (i) they were anticipated by Payne; and (ii) were obvious under Munnekehoff or Barmag combined with Ligon.  (A90 (grounds 11, 3 & 8, respectively).)  Shaw argued that a POSITA would make common sense modifications to the movable carts in Munnekehoff and Barmag to either tie together existing neighboring packages or add additional neighboring packages.  (A106; A120-21.)  As to the former (tying together existing packages), Shaw argued that "the package arrangement disclosed in Munnekehoff lends itself to the interposing arrangement of Ligon," which is "particularly true since, as recognized by the ['360 patent], the tying together of neighboring packages to obtain longer, continuous run time is well-known and widely used in the industry."  (A155 (¶ 32).)  As to the latter (adding packages), Shaw showed that, "consistent with the widespread and longtime use

---

[6] ACS previously filed suit against Shaw in the United States District Court for the Northern District of Georgia on February 8, 2012, alleging Shaw infringed the '360 patent.  On October 19, 2012, the suit was dismissed without prejudice, as ACS did not own the '360 patent asserted against Shaw.  (*See* A89.)

of tying together neighboring packages, modifying the creel structures to accommodate additional pegs and associated packages to creels is commonly used in the industry . . . Applying common sense, a [POSITA] would have" done the same in combining two pairs of linked packages, as disclosed in Ligon, with the creel structures in Munnekehoff and Barmag.   (A156 (¶ 33); A166 (¶ 57).)  For Barmag, Shaw further argued that a POSITA would be motivated by, for example, increasing continuous runtime, a well-known practice in the industry as recognized by Barmag and the patent itself. (A166 (¶ 58); A167-68 (¶ 59).)

For the Non-Interposing Claims, Shaw argued, and the Board agreed, they were anticipated by either Munnekehoff or Barmag and/or were obvious under combinations of these two primary references with additional prior art.  (A90 (grounds 1-2, 4-7, 9-10 & 12-15).)

## 2.    ACS's Preliminary Response

In its preliminary response, ACS argued, *inter alia*, that a POSITA would not combine Ligon with Munnekehoff or Barmag because this would result in ensnarement of yarn around the center tubes,[7] causing inoperability.  (A409-13;

---

[7] The Board and parties occasionally referred to ensnarement as "entanglement" or "wrapping around."

A424-26 ("wrap around").)  ACS did not argue that Ligon taught away from

using "sharp turns" or ninety-degree turns.

### 3.    The Board's Institution Decision

The Board instituted IPR as to all claims but claim 4,[8] finding that Shaw

had provided a reasonable likelihood of prevailing on these claims.

For the Non-Interposing Claims, the Board instituted IPR on grounds 1

and 6 (anticipation by Munnekehoff and Barmag), and denied all other

anticipation and obviousness arguments as "redundant." (A470; A476-78.)  The

Board provided no explanation for its redundancy ruling, citing only 37 C.F.R. §

42.108.  (A477.)

For the Interposing Claims, the Board instituted IPR on grounds 3 and 8

(obvious under Munnekehoff or Barmag in view of Ligon). (A470; A476-78.)

The Board denied Shaw's asserted anticipation ground under Payne (ground 11).

Again, the Board provided no explanation for its redundancy ruling, citing 37

C.F.R. § 42.108. (A477.)

### 4.    ACS's Response

In its Response to Shaw's petition, ACS did not address the Non-

Interposing Claims.  (*See* A526.)  ACS thus admitted the instituted grounds in

---

[8] As to claim 4, the Board later instituted IPR2013-00584, to be addressed
in ACS's red brief and Shaw's yellow brief.

24

Shaw's petition for the Non-Interposing Claims, conceding unpatentability.

(A485-86 ("caution[ing]" ACS "that any arguments for patentability not raised

and fully briefed in [its] response will be deemed waived.").)

ACS instead addressed only the Interposing Claims, primarily advancing

two arguments.  First, ACS alleged that Munnekehoff or Barmag in combination

with Ligon would be inoperable because a POSITA would not know to avoid

ensnarement when tying together neighboring packages.  (A554-56.)  Second,

ACS argued that Ligon teaches away from the proposed combinations because

Ligon has a horizontal arrangement that avoids "sharp" turns, while

Munnekehoff and Barmag are vertical arrangements with ninety-degree angles,

and thus a POSITA would not combine the four-package arrangement of Ligon

with the arrangements in Munnekehoff and Barmag.  (A541-45.)  In presenting

these arguments, ACS relied on the testimony of its proffered expert, the named

inventor and sole owner of ACS, David Chadwick.

### 5.    Shaw's Reply Responding to ACS's Inoperability and Sharp Turns Arguments

As to inoperability due to ensnarement, Shaw showed that a POSITA

would know not to simply cut and paste the Ligon package arrangement onto the

Munnekehoff or Barmag frames, but instead would make common sense

adjustments to optimize operation.  (A693-94.)  Dr. Youjiang Wang, Shaw's

expert, provided examples of such adjustments, including sensibly routing the

yarn in Munnekehoff so that, for each level, it does not wrap around the tubes

extending from lower levels.  (A710-11 (¶ 28).)  Dr. Wang depicted this by

annotating the relevant portion of Munnekehoff's Fig. 1, which is an aerial view

of the Munnekehoff system.  (*Id.*)



Example 1

In this annotation, Dr. Wang showed the tube for the given level as tube P, and

the tube extending from the lower level as tube Q.  (*Id.*)  These tubes are shown

in Munnekehoff figures 1 and 2, albeit without the "P" and "Q" labels.  Dr.

Wang showed that a POSITA would route the yarn such that it does not wrap

around tube Q.  (*Id.*)

As to Ligon's alleged teaching away from "sharp" turns, Shaw countered

that Munnekehoff and Barmag have the same number of turns as Ligon (A702-

03 (¶¶ 14-16)), and that the references' turns are comparable to those in Ligon.

26

(A704-05 (¶18).)  Shaw further explained that Ligon has many other teachings besides its horizontal orientation, all of which would motivate a POSITA to combine its four-package arrangement with Munnekehoff or Barmag.  (A700-02 (¶¶ 9-12).)  Finally, Shaw argued that "particularly sharp[]" as used in Ligon did not mean ninety-degrees, as the reference lacked any criticism of ninety-degree turns.  (A704 (¶17).)

Because of the Board's prior redundancy ruling, Shaw was denied the opportunity to show that Payne anticipates, and also should not be vulnerable to any "ensnarement" or "sharp turns" arguments.

### 6.    Oral Hearing

At the oral hearing, ACS again urged its inoperability and teaching away arguments.  In support of the former, ACS introduced (over Shaw's objection (*see* A1017-18)) exhibits allegedly showing how ensnarement would occur if Munnekehoff or Barmag added neighboring packages to create a four-package arrangement like that in Ligon.  (A915-24.)  However, the exhibits were not depictions of Munnekehoff or Barmag combined with Ligon; rather, the exhibits were based on a '360 patent embodiment (*i.e.*, Fig. 13).  (*Id.*)

*Sua sponte*, the Board asked whether it was proper for Dr. Wang to provide details regarding how a POSITA would avoid ensnarement in

combining Munnekehoff or Barmag with Ligon in Shaw's reply as opposed to Shaw's petition.[9]  (A2635:1-A2336:4; A2695:11-24.)  Shaw explained that these examples were rebuttal to ACS's responsive ensnarement arguments.  (*Id.*)

### 7.    The Board's Final Written Decision

The Board found that Shaw had shown by a preponderance of the evidence that the Non-Interposing Claims were obvious.  (A49.)  The Board found Shaw had not made the same showing for the Interposing Claims.  (A50.)  Procedurally, the Board alleged Dr. Wang's response to ACS's ensnarement argument was untimely and should have been included in Shaw's petition.  (A22-23.)  Substantively, the Board found ensnarement would result if a POSITA combined Munnekehoff or Barmag with Ligon, referring to ACS's '360 patent exhibits (Fig. 13) depicting ensnarement.  (A21-22.)  The Board further concluded that a POSITA would have to "completely redesign" Munnekehoff or Barmag to avoid ensnarement.  (A19.)  In so finding, the Board expressly relied on its misconception that Dr. Wang included an "additional tube"—tube Q—to Munnekehoff, stating "[t]he use of tube Q . . . is not disclosed in the cited references."  (A23.)  Finally, the Board found that Ligon's disclosures regarding

---

[9]  None of ACS's pre-hearing motions alleged Dr. Wang's provision of examples as to how a POSITA would avoid ensnarement were improper new evidence, nor did ACS ever allege Dr. Wang's examples were untimely.

"particularly sharp[]" turns taught away from adding neighboring packages to the Munnekehoff/Barmag frames. (A25-28.)

The Board did not address any prior art it previously deemed redundant, including Payne.

## SUMMARY OF THE ARGUMENT

The Court should reverse the Board's decision finding the Interposing Claims would not be obvious based on a combination of Ligon with Munnekehoff or Barmag.

The Board erred in finding that the combination of Ligon with Munnekehoff or Barmag would result in inoperability. The Board based its contrary conclusion on the wrong legal standard, incorrectly focusing on the actual, physical substitution of elements, and thus ignoring the common sense modifications a POSITA would make in combining the prior art. Here, a POSITA would consider the yarn path in combining the prior art and, in so doing, easily route the yarn to avoid ensnarement in the four-package arrangement consistent with how Munnekehoff already avoided ensnarement in the two-package arrangement. In addition to disregarding this common sense adjustment, the Board relied on a significant misunderstanding of a key figure in the record, a conclusory affidavit from ACS's sole owner that lacked evidentiary

29

support, and ACS's eleventh-hour exhibits that mischaracterized the prior art.

Thus, the Board's decision on this point is not supported by substantial

evidence.

The Board's finding that Ligon teaches away from combination with

Munnekehoff or Barmag is also based on legal error and not supported by

substantial evidence.  The Board erred as a matter of law in solely considering

Ligon's "primary objective" to the express exclusion of its other teachings, as

well as those of Munnekehoff and Barmag.  Further, the Board's conclusion that

Ligon's use of "particularly sharp[]" means "ninety degrees" was again based on

a misreading of the record and the patentee's conclusory statements as ACS's

expert.

The Board's finding that Shaw's rebuttal arguments to ACS's responsive

declaration constituted untimely new evidence is also based on legal error and

not supported by substantial evidence.  The Board based its determination on the

incorrect standard of whether the evidence in Shaw's reply "could have been"

submitted in its petition.  Under the correct standard, Shaw reasonably replied to

the patentee's unforeseeable responsive arguments that despite Munnekehoff

and Barmag avoiding ensnarement in a two-package arrangement, a POSITA

would somehow ignore those teachings when adding two more yarn packages

and tie the packages together in a senseless fashion to cause inoperability.

Separately, the Board's failure to consider Shaw's ground based on Payne

in the final written decision ("the Payne-based ground"),[10] after labeling such

ground redundant was "arbitrary and capricious" and does not warrant *Chevron*

deference for at least three reasons. First, the Board's application of what Shaw

terms the "Redundancy Doctrine" is at odds with the AIA's provisions regarding

estoppel and protection of the integrity of the patent system, as it arbitrarily cast

aside the potentially invalidating Payne-based ground that may be barred from

ever receiving substantive review. Second, the Board's decision to exclude the

Payne-based ground was unreasonable since Shaw's petition was based on only

15 grounds, as compared to the 422 grounds proffered in *Liberty Mutual*, the

case in which the Redundancy Doctrine was first announced. Finally, the

Board's requirement that Shaw dedicate portions of its limited briefing space to

compare and contrast the "strengths and weaknesses" of its grounds and

references is arbitrary and unreasonable. In the event this Court does not

invalidate the foregoing claims based on a combination of Ligon with

---

[10] While Shaw asserted five grounds based at least in part on Payne, the only ground relevant on appeal in No. 15-1116 is ground 11, which covers, *inter alia*, the Interposing Claims. (*See* A90.)

31

Munnekehoff or Barmag, it should either (i) remand this case to the Board to

conduct *inter partes* review proceedings during which Shaw may also rely on

the Payne-based ground, or (ii) hold that Shaw is not estopped from relying on

the Payne-based ground to invalidate the '360 patent in any future proceeding.

## ARGUMENT

## I.    STANDARD OF REVIEW

Whether an invention would have been obvious is a question of law based

on underlying facts. *In re Kotzub*, 217 F.3d 1365, 1369 (Fed. Cir. 2000).  This

Court reviews the Board's ultimate conclusion of obviousness *de novo* and the

Board's factual findings for substantial evidence. *In re Gartside*, 203 F.3d 1305,

1316 (Fed. Cir. 2000).  Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

Obviousness rests on four factual determinations:  (1) the scope and

content of the prior art; (2) the differences between the claimed invention and

the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of

nonobviousness, such as commercial success.  *KSR Int'l Co. v. Teleflex Inc.*, 550

U.S. 398, 406 (2007).  The presence or absence of a motivation to combine

references in an obviousness determination is a question of fact.  *In re Gartside*,

203 F.3d at 1316.  Teaching away is a question of fact.  *In re Mouttet*, 686 F.3d 1322, 1333 (Fed. Cir. 2012).

Under the Administrative Procedure Act ("APA"), the reviewing court shall set aside agency action (as opposed to underlying factual issues associated with obviousness) if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

## II.    THE '360 PATENT IS OBVIOUS

ACS admits that all elements of the Interposing Claims are disclosed in Munnekehoff, Barmag, and Ligon.  (A2658 (40:8-14).)  Therefore, the sole issue is whether the prior art, taken together, would have suggested the use of four interconnected packages in a vertically arranged creel to a POSITA at the time of the alleged invention.  *In re Keller*, 642 F.2d 413, 424 (C.C.P.A. 1981).  Had the Board applied the correct legal standards—namely, (i) considering a POSITA's common sense and crediting that POSITA with making common sense prior art modifications to avoid inoperability, and (ii) considering the totality of the references' disclosures—it would have.

## A.    The Obviousness Analysis

An invention is unpatentable as obvious if the differences between the patented subject matter and the prior art would have been obvious at the time of invention to a person of ordinary skill in the art.  35 U.S.C. § 103(a).  In determining if a patent is obvious, no explicit teaching, suggestion, or motivation is required.  *KSR*, 550 U.S. at 415-18.  Rather, if a patent, through the "simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement," does no more than simply yield predictable results, the invention is obvious and thus unpatentable.  *Id.* at 417-18.

## B.    The Board's Finding That Combining Munnekehoff or Barmag with Ligon Would Result in Inoperability is based on Legal Error and Not Supported by Substantial Evidence

### 1.    The obviousness analysis must include consideration of modifications a POSITA would make to the prior art to avoid inoperability

"It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements." *In re Mouttet*, 686 F.3d at 1332.  Rather, in analyzing obviousness, one must consider reasonable modifications within a POSITA's skill set to create an operable combination, which modifications do not teach away or

34

suggest a lack of motivation to combine. *See, e.g., In re Icon Health & Fitness, Inc.*, 496 F.3d 1374, 1382 (Fed. Cir. 2007).

The Board failed to consider the reasonable modifications a POSITA would make to operably combine Ligon with either Munnekehoff or Barmag. Here, the Board found that a POSITA would not combine Ligon or Munnekehoff "due to the tangling that would result . . . ." (A21.) But the Board failed to consider how a POSITA would apply common sense to *avoid* "tangling,"—namely, by contemplating the resulting yarn path in combining Ligon with Munnekehoff or Barmag. (*See infra* Sect. II.B.2.) Indeed, the Board found that a POSITA "would have a degree in mechanical engineering or a similar discipline, and multiple years of work experience with creels." (A11.) Such a person would certainly have the requisite skill and knowledge to route yarn in the proposed prior art combinations to avoid ensnarement.

The Court properly considered such common sense modifications in finding obviousness in *In re Icon*, 496 F.3d at 1382. There, where the patent related to a treadmill with a certain spring allowing collapsibility, the patentee argued that a POSITA would not combine a prior art treadmill with a prior art spring from a folding bed because "the counterweight mechanism from [the spring reference] uses a large spring that would overpower [the patent's] treadmill mechanism, thus

producing a result inoperable for its intended purpose." *Id.* This Court rejected this inoperability-based teaching away argument, finding a POSITA would know to use a weaker spring than the one disclosed when adapting the spring to the claimed invention. *Id.* ("[W]e do not ignore the modifications that one skilled in the art would make to a device borrowed from the prior art. One skilled in the art would size the components from [the spring reference] appropriately for [the patent's] application, therefore producing an embodiment meeting [the patent's] claims.") (internal citations omitted).[11]

This Court similarly accounted for common sense modifications in *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 989-90 (Fed. Cir. 2006). There, the relevant patent concerned a proton beam cancer therapy system. The patentee argued that a POSITA would not combine two pieces of prior art because one reference used a high intensity proton beam that "would kill patients rather than cure them" if modified for combination. *Id.* at 989. This Court disagreed, finding that a POSITA—who had at least "a working familiarity with particle beam technology, particularly as it applies to cancer treatment"—would certainly know to modify the prior art proton beam so that patients would not die. *Id.* at

---

[11] The Board cites to *In re Icon* in the final written decision (A21), yet fails to apply the analysis contained therein.

989-90 ("Clearly, one of ordinary skill in the art would not simply remove the beryllium plate and direct the high intensity proton beam at a patient without further calculation or adjustment.").

The Board's failure to address a POSITA's common sense considerations in combining Ligon with either Munnekehoff or Barmag represents a fundamental misapplication of obviousness law, improperly requiring the actual, physical substitution of elements without contemplating reasonable modifications within a POSITA's skill set.

> **2.    The Board's conclusion that a POSITA could not combine the prior art without a "complete redesign" is based on factual error and insubstantial evidence**

The Board also erred in concluding that a POSITA would not reasonably modify the art to accommodate neighboring packages, incorrectly finding that the only way to prevent ensnarement was to "'completely redesign Munnekehoff [or Barmag][12] so that the strands no longer travel upwards . . . through the next level.'"  (A19 (quoting ACS Resp., A554).)

As Dr. Wang explained, no significant structural modifications of Munnekehoff or Barmag are necessary to avoid ensnarement.  A POSITA would

---

[12] *See* A30 ("We agree with ACS that Shaw's proposed modification of adding a second bobbin to either side of the frame in Barmag would, absent a significant redesign, result in entanglement… .").

merely route the yarn such that it would not wrap around the tube extending from the lower level. Dr. Wang demonstrated this common sense concept using an annotated version of the relevant portion of Munnekehoff's Figure 1. Like the '360 patent's aerial Figure 13 (on which ACS and the Board relied (A915-24; A20)), Figure 1 is a "top view" of the Munnekehoff creel, such that one can only see the top row and not the lower rows "stacked one above the other." (A279 (10:16, 27-29).) Thus, Figure 1 does not show either the tube to which yarn is being fed at the depicted level or the tube extending from the lower level, both of which are shown in Figure 4, below. In showing how a POSITA would route the yarn to avoid ensnarement, Dr. Wang annotated Figure 1 to identify the given level's tube (tube P) and the lower level's tube (tube Q) and demonstrated that a POSITA would route the yarn such that it did not wrap around tube Q:

| Annotated Figure 4 (side view) from Munnekehoff | Figure 1 (aerial view) from Munnekehoff | Annotated Figure 1 (aerial view) from Dr. Wang's Reply Declaration (A710-711 ¶ 28) |
|---|---|---|
|  |  |  |

38

The Board fundamentally misunderstood Dr. Wang's explanation. In finding that a POSITA would not "select/adjust yarn paths in a manner that avoids ensnarement," as argued by Shaw and explained by Dr. Wang, the Board mistakenly found that Dr. Wang proposed "*adding* a tube Q to the assembly to *prevent* ensnarement," that "[t]he use of tube Q . . . is *not disclosed* in the cited references," and that "Dr. Wang does not provide any basis . . . for *adding* the additional tube to Munnekehoff in the manner proposed . . . ." (A22-23 (emphasis added).) This is incorrect. Dr. Wang did not propose adding tube Q; rather, as made plain in Dr. Wang's reply declaration, "[t]ube Q, whose position is based on Fig. 4 of Munnekehoff, represents a tube travelling upward from the lower level." (A710-11 (¶ 28).) The Board's clear error here cannot amount to substantial evidence.

In addition to this indisputable error, the Board based its "complete redesign" finding on the patentee's conclusory statements and improper eleventh-hour exhibits. First, the Board relied on Mr. Chadwick's statements that "only . . . complete[] redesign" would permit combinability (A20, citing Chadwick Decl., A606-07 (¶ 59)) and, his equally cursory annotation of Munnekehoff Figure 4, reproduced below, allegedly *showing* ensnarement.



(A20.) Such statements, devoid of any supporting information, do not amount to substantial evidence, especially in light of Dr. Wang's common sense explanation to the contrary. *See Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1294 (Fed. Cir. 2007) (finding expert's conclusory testimony on lost profits did not amount to substantial evidence)*; c.f. In re Chevalier*, 500 Fed. Appx. 932, 934 (Fed. Cir. 2013) (non-precedential) (rejecting applicant's inoperability argument where it was based "on his own interpretive drawings" that improperly focused on physical combinability and ignored common sense POSITA modifications).

Second, while professing their mere "illustrative" nature, the Board relies on ACS's annotated *'360 patent exhibits* as allegedly "showing the rotation [of yarn] and how the tangling would occur" in *Munnekehoff.* (A20.) These exhibits (one of which is reproduced below) do not address Munnekehoff at all, let alone how yarn would be routed in the same, and thus cannot amount to substantial evidence of alleged nonobviousness in combining Munnekehoff with Ligon. As Shaw explained, a POSITA adhering to Munnekehoff's teachings would avoid ensnarement in the four-package configuration, just as it did in the two-package arrangement.



(A922.)

To avoid any confusion, below are even further detailed renderings of Munnekehoff, but with a four-package arrangement consistent with Dr. Wang's annotated Figure 1. These show: (1) interposing without ensnarement (see yarn path in red after point 9 not wrapping around tube Q), and, for comparison, (2) interposing with ensnarement (same yarn path wrapping around tube Q), which the Board erroneously concluded would necessarily result in combining Munnekehoff with Ligon.



| Interposing without Ensnarement[13] (shown by Shaw) | Interposing with Ensnarement (alleged by ACS) |
|---|---|

---

[13]The yarn path is depicted sequentially from points 1 through 9.

42

To be clear, as shown below, ensnarement is *possible* in the 1984 two-package Munnekehoff arrangement; that it does not ensnare shows a POSITA would plainly know—in fact, already did know—how to route the yarn so it does not wrap around the tubes.  Certainly, they would apply that knowledge in the four-package interposing arrangement.



In sum, the Board both applied an incorrect legal standard and made critical factual errors.  The Board "misapprehended the nature of the obviousness inquiry. The obviousness inquiry does not ask 'whether the references could be physically combined but whether the claimed inventions are rendered obvious by the teachings of the prior art as a whole.'" *In re Chevalier,* 500 Fed. Appx. at 934

(quoting *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (*en banc*).)  Just as this Court found that the POSITAs in *In re Icon* and *Optivus* would have applied common sense to operably combine the prior art, so would a POSITA have reasonably considered the resulting yarn path in combining Ligon with Munnekehoff or Barmag to avoid ensnarement.  Further, the Board's ensnarement conclusion is based on its incorrect factual interpretations and the patentee's conclusory statements, ignoring common sense and the prior art's contrary teachings.  This is not substantial evidence, and thus the Board's ruling should be reversed.

Notwithstanding the foregoing, the claims are obvious given that they do not recite any multi-level aspects to which ACS's anchors its ensnarement argument.  The claims only discuss single-level arrangements.  Thus, even if a POSITA failed to use common sense and tied the four packages together in a multi-level arrangement, as ACS contends, it is not disputed that ensnarement would not occur on the lowest level of Munnekehoff or Barmag when combined with Ligon, as there is no tube around which the yarn can wrap.  (*C.f.* A2667:7-24.)

### C.    The Board's finding that Ligon Teaches Away from Combination with Munnekehoff or Barmag is based on Legal Error and Not Supported by Substantial Evidence

"Under the proper legal standard," a reference only teaches away when it "suggests that the developments flowing from its disclosures are unlikely to produce the objective *of the applicant's invention*." *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005) (emphasis added). Stated differently, teaching away only occurs where the prior art "suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought *by the applicant*." *In re Gurley*, 27 F.3d at 553 (emphasis added).) Thus, the question here is whether a POSITA would think, after looking at Ligon, Munnekehoff, and Barmag, that she would be unsuccessful in increasing runtime by adding neighboring packages to, or tying together existing packages on, Munnekehoff or Barmag, resulting in a four-package configuration. The answer is no.

### 1.    The Board erred in focusing solely on Ligon's "primary objective" and disregarding other teachings

In evaluating what a reference would teach a POSITA, all motivations are relevant. *See Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1369 (Fed. Cir. 2012) (finding a claimed invention obvious *even though* a prior art reference taught away from using a substance for a particular purpose, because

45

the reference also demonstrated that a POSITA would have been motivated to use the substance "as claimed" for other purposes); *KSR*, 550 U.S. at 420 ("Common sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle.")

A POSITA would be motivated to combine Ligon with Munnekehoff or Barmag to achieve the '360 patent's stated objective of increasing efficiency via increasing continuous runtime.  (A71 (2:36-38); A74 (8:32-52).)  This objective is echoed in Ligon (A357 (1:20-24), as a general industry maxim), Munnekehoff (A274 (5:21-25); A276 (7:24-27)) and Barmag (A316 at [0006]-[0007]).  Ligon's teachings are not limited to eliminating turns or horizontal yarn delivery.  (A701-702 (¶¶ 11-12).)  Ligon discloses a four-package arrangement to increase runtime.  (A357 (1:20-31); A354.)  Ligon discloses adaptability between two and four-package arrangements.  (A358 (3:17-19, 3:47-49); A700-01 (¶ 10).)  In fact, one of Ligon's stated objectives is to create "highly versatile" textile machinery, "which can be easily reconfigured."  (A357 (1:65-2:2).)  Ligon also explains that the pre-1995 prior art contained four-package arrangements on vertically arranged creels to increase runtime, including Singer.  (A357 (1:20-31).)  And the concept of tying neighboring packages together to

46

increase continuous runtime was been well-known in the art long before Mr. Chadwick's alleged invention, as Mr. Chadwick himself testified. (A725 (36:2-11), cited in Wang Repl. Decl., A699-700 (¶ 8); A357 (1:11-24).) The Board cannot properly ignore these teachings. *See Alcon,* 687 F.3d at 1369.

Yet, the Board did exactly that, erroneously finding that only Ligon's "primary objective" mattered in assessing motivation, and implying that Shaw was required to "disprove[]" Ligon's "primary objective of minimizing sharp changes in direction." (A27-28.) This is not the law. *Alcon,* 687 F.3d at 1369; *KSR*, 550 U.S. at 420. That Ligon has a breakage-reduction objective does not remove its other teachings, or those of Munnekehoff and Barmag, from the prior art and thus a POSITA's consideration.

When Ligon is viewed for all its disclosures, especially in combination with Munnekehoff and Barmag, no basis exists on which to conclude that a POSITA would be discouraged from either adding neighboring packages to Munnekehoff or Barmag, or tying existing packages together, to increase runtime. Such a conclusion would require a POSITA to ignore Ligon's full teachings, Barmag's and Munnekehoff's teachings, and well-known concepts in the art at the time of invention.

47

### 2. "Particularly sharp[]," as used in Ligon does not mean "ninety degrees"

Even if the Court finds that Ligon teaches away, it at most teaches away—as relevant to this appeal—from arrangements having "particularly sharp[]" turns. (A26 (in dismissing Shaw's showing that Munnekehoff has the same number of turns as Ligon, the Board stated: "[I]t is the 'increased angles' of "particularly sharp[]' turns that are of concern, not necessarily the number of turns overall"); *see also* A25-28; A30-31 (basing decision on sharpness of turns, not number of turns).)

Notably, Ligon does not define "particularly sharp[]" as ninety degrees or otherwise. As with ensnarement, the Board's only bases for equating "particularity sharp[]" with ninety degrees are the Board's misunderstanding of the record and the patentee's conclusory statements.

Ligon expressly contemplates angles sharper than those depicted in its figures—possibly even ninety degrees—because front frame (18) can be moved towards rear frame (20) ("to accommodate weak yarns"), which would necessarily sharpen the angle between guides C and the packages (*e.g.*, 16c). (A359 (5:24-36); A704-05 (¶ 18); see figure 1, below.)



The Board acknowledged this fact, but improperly dismissed Ligon's admitted reference to using sharper angles because the Board mistakenly believed Ligon described other steps to avoid those sharper angles:

> Ligon discloses that as front frame section 18 is moved toward rear frame section 20, it is "necessary" to adjust lower yarn packages 16c and 16d . . . . Shaw is correct that front frame section 18 may be moved toward rear frame section 20 in Ligon (*which would otherwise decrease the angle* between yarn package 16c and yarn eyelet assembly C), [but] Shaw does not account for the fact that a corresponding adjustment would be made in the level of yarn package 16c.

(A27 (emphasis added).)  This is, again, incorrect.  A corresponding adjustment in the level of the lower packages (16c and 16d) does not change the fact that the

angles between these lower packages and guide C would still become sharper as frame 18 moves closer to frame 20, as shown below in annotated Figure 1.  (*See also* A704-05 (¶ 18).)



| Figure 1 | Figure 1<br>**showing frame 18 closer to frame 20 *and* "corresponding adjustment" of 16c** |
|---|---|

In addition to this error, the Board bases its equation of "particularly sharp[]" with "ninety degrees" on Mr. Chadwick's conclusory statements in his expert declaration.  (*See* A26 (citing Chadwick Decl., A596-99 (¶¶ 38-47)).)  Of the ten paragraphs of the Chadwick declaration to which the Board cites, only two purport to offer any explanation of "particularly sharp[]'s" meaning in Ligon, stating: (1) "Ligon expressly teaches away from 'sharp' turns, such as the 90 degree bends in Munnekehoff and Barmag" (A598 ¶ 40); and (2) "After reading the specification . . . [a POSITA] would not think to go against

50

[Ligon's] teachings and cause the yarn to undergo the two consecutive 90°
bends required by Munnekehoff, Barmag, or my invention." (A598 ¶ 42.)  In
other words, Mr. Chadwick offered *no explanation* for his testimony that
"particularly sharp[]" as used in Ligon means ninety degrees.  ACS offered, and
the Board relied on, nothing but the patent owner's conclusory assertions on this
point.

In contrast, Dr. Wang stated that Ligon's avoidance of "particularly
sharp[]" angles does not require foregoing all ninety-degree angles at least
because ninety-degree turns are commonly used in the industry without causing
yarn breakage.  (A704 (¶ 17).)  Indeed, "[e]ven the '360 patent, for example,
indicates a desire to prevent breakage yet incorporates angles at or more acute
than 90-degrees."  (A704 (¶ 17) (citing A72 (3:55-57 & Figs. 9, 13, & 15).)
Munnekehoff also expresses a desire to prevent breakage, yet discloses use of a
ninety-degree angle.  (A278 (9:12-15).)

Ligon lacks any criticism of ninety-degree turns.   In fact, the record lacks
any genuine support for the holding that "particularly sharp[]" means ninety
degrees.  The Board's contrary holding is not supported by substantial evidence.

**D.    The Board's Clearly Erred in finding that Shaw's Rebuttal Arguments to ACS's Responsive Declaration Constituted Untimely New Evidence**

The rules governing IPR practice explicitly permit a petitioner to file replies and reply evidence.  37 C.F.R. § 42.23.  However, "[r]eply evidence must be responsive and not merely new evidence that could have been presented earlier" in the petition.  PTAB Trial Practice Rules and Judicial Review of PTAB Decisions, 77 Fed. Reg. 48,612, 48,620 (Aug. 14, 2012).  "Examples of indications that a new issue has been raised in a reply include new evidence necessary to make out a *prima facie* case for patentability or unpatentability . . . and new evidence that could have been presented in a prior filing."  Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012).

The Board found Dr. Wang's reply testimony regarding ensnarement untimely, stating "[n]one of the analysis in Dr. Wang's reply declaration . . . was included with Shaw's Petition."  (A22.)  Specifically, the Board stated that Shaw proposed in its Petition "only to add a second bobbin on either side of the frame . . . [such] that Ligon's teachings of two bobbins on one side of the frame could [] *just be inserted* into the Munnekehoff assembly."  (A23 (emphasis added).)  By comparison, the Board found that "Dr. Wang's reply declaration propose[d] making different changes to allow Munnekehoff to be combined with Ligon,"

taking particular exception with Shaw's statement at the hearing that "some changes would be necessary to combine the two references." (A23.) Finally, the Board concluded that Shaw had "not provide[d] any reason…as to why the changes proposed in its Reply *could not have been discussed earlier* in the Petition." (*Id.* (emphasis added).)

The Board applied the wrong test. "[T]he standard for determining whether a Reply is appropriate is not whether an argument contained therein or evidence submitted therewith 'could have been' submitted in the original petition." *Liberty Mutual Ins. v. Progressive Casualty Ins. Co.*, CBM2012-00002, Paper 38 at 2 (Sept. 3, 2013); *Berk-Tec LLC v. Belden Techs., Inc.*, IPR2013-00057, Paper 29 at 2 (Sept. 10, 2013) ("[I]t is not the test for determining appropriateness of a Reply merely to see whether information was previously available to [Petitioner] and could have been submitted with its Petition.").) Rather, the proper test is whether the Petitioner was reasonably responding to unforeseeable arguments made in patent owner's responsive briefing. *See, e.g., Vibrant Media, Inc. v. General Electric Co.*, IPR2013-00172, Paper 50 at 42 (July 28, 2014). As shown below, Shaw did just that.

Further, the Board misunderstands the record. First, Shaw proposed combinations including either tying together existing packages *or* adding

53

additional packages (A155-56 (¶¶ 32- 33), A166-68 (¶¶ 58-59)), not "*only* to *add* a second bobbin on either side of the frame . . . ." (A23 (emphasis added).) Second, neither Dr. Wang nor Shaw, in relying on his testimony, proposed the actual, physical insertion of elements from Ligon (neighboring packages) onto Munnekehoff or Barmag's frames. Instead, Shaw contemplated common sense modifications would need to be made, consistent with POSITA's skill and knowledge. (A106 (stating that a POSITA "would have been motivated to *modify* the stock and standby sections of Munnekehoff such that each of the stock and standby bobbins on the stock and standby sections, respectively, are replaced with a pair of bobbins as taught by Ligon [] such that, for example, runtime per side is lengthened.") (citing Wang Decl., A152-56 (¶¶ 28-33)) (emphasis added).) This is consistent with well-settled patent law denouncing focus on the actual, physical substitution or incorporation of elements in obviousness analysis (*c.f. In re Mouttet*, 686 F.3d at 1332; *In re Etter*, 756 F.2d at 859). The Board's reasoning here only underscores its fundamental misunderstanding, or at least misapplication, of the obviousness analysis.

The Board's untimeliness finding also rests on clear error. This finding is again predicated on the Board's erroneous conclusion that Dr. Wang proposed adding a "tube Q." (*See* A22-23.) Dr. Wang did not propose adding tube Q; he

54

proposed simply routing the yarn in a four-package arrangement such that it did not wrap around one of Munnekehoff's *existing tubes* (which he labeled "tube Q" for easy reference), precisely consistent with how Munnekehoff routed the yarn in its two-package arrangement.

Dr. Wang's explanation here is not improper "new evidence." "The mere fact that the reply declarations cite to evidence not specifically referred to or discussed in [the] petition is insufficient to establish impropriety of such evidence . . . . The very nature of a reply is to respond to the opposition . . . ." *Liberty Mutual Ins. v. Progressive Casualty Ins. Co*., CBM2012-00003, Paper 78 at 67 (Feb. 11, 2014) (citing 37 C.F.R. § 42.23(b)). Instead, the proper inquiry is whether the arguments made by patent owner in its responsive briefing "reasonably might . . . have triggered" the petitioner's reliance on rebuttal testimony. *Vibrant Media, Inc. v. General Electric Co.*, IPR2013-00172, Paper 50 at 41-42. Such reliance is proper where the "rebuttal testimony simply addresses [the patent owner's] argument presented in the Patent Owner Response . . . ." *Id.*

Such is the case here. In illustrating how a POSITA would route yarn in relation to tubes P and Q, Dr. Wang responded to Mr. Chadwick's assertion that "only through complete redesign" could Ligon be combined with Munnekehoff

55

or Barmag to avoid ensnarement.  (A709-11 (¶¶ 25-28), citing ACS Resp.,

A554.)  Mr. Chadwick's argument is not one that Shaw should have reasonably

foreseen, like "fail[ing] to address a certain claim limitation" in its petition.

*Liberty Mutual Ins. v. Progressive Casualty Ins. Co*., CBM2012-00003, Paper

78 at 67.  Rather, as discussed above, that a POSITA would consider the yarn

path in adding packages to Munnekehoff and Barmag is common sense, and

Shaw would not have anticipated ACS making a "complete redesign" argument

to the contrary.  "A petitioner is not expected to anticipate, in its petition, every

counterargument a patent owner might make in response."  *St. Jude Med. v. Bd.*

*of Regents of the Univ. of Michigan*, IPR2013-00041, Paper 69 at 32-33 (May 1,

2014); *Berk-Tec*, IPR2013-00057, Paper 29 at 2 ("It [] would be unreasonable to

expect a Petitioner to submit supporting testimony for every matter that possibly

may be involved in a dispute.").[14]

---

[14] Similarly, the Board does not allege, nor can ACS credibly claim, that Dr. Wang's depiction of stranding yarn in relation to tubes P and Q was necessary to establish Shaw's *prima facie* invalidity case.  *See Liberty Mutual Ins. v. Progressive Casualty Ins. Co*., CBM2012-00002, Paper 38 at 2:

Nor is it the case that ACS suffered any prejudice as a result of Dr. Wang's reply declaration.  ACS had the "right to cross-examine [Shaw's] reply declarant[] and then, [if deemed an] appropriate circumstance, request authorization to file a motion for observation on cross-examination." *Liberty Mutual Ins. v. Progressive Casualty Ins. Co*., CBM2012-00002, Paper 38 at 3. ACS chose not to depose Dr. Wang in IPR2013-00132.  In fact, ACS never alleged the at-issue ensnarement testimony was untimely "new evidence." Rather, the Board raised this issue for the first time at the oral hearing.  The parties did not brief or otherwise substantively address this issue below.

There is no legal or factual basis on which to conclude Dr. Wang's testimony was untimely under 37 C.F.R. § 42.23(b).  The Board's contrary conclusion should be reversed.

Under all properly considered evidence, the patent does no more than simply yield the predictable result of increasing runtime of a movable cart-based creel by adding neighboring packages or tying existing neighboring packages

*Cont'd*——————————

[T]he Board already determined it is more likely than not that Petitioner would prevail on one or more grounds of alleged unpatentability [in granting the IPR petition]; thus, it is generally less likely than in the case of a motion which has not yet been reviewed by the Board that Petitioner in its initial petition did not make out a *prima facie* case and needs to rely on its reply to do so.

57

together.  ACS's contrary proffering of nothing but the patentee's conclusory statements is insufficient.  The patent is thus obvious and unpatentable.

## III.    THE BOARD ERRED IN REJECTING PAYNE AS REDUNDANT

Shaw requests that this Court "hold unlawful and set aside" the Board's application of its Redundancy Doctrine, and its findings and conclusions relating thereto as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### A.    This Court has jurisdiction to review the Board's redundancy ruling

Final written decisions are appealable only to this Court.  35 U.S.C. § 319 ("A party dissatisfied with the final written decision of the Patent Trial and Appeal Board under section 318(a) may appeal the decision pursuant to sections 141 through 144.").  Shaw challenges the Board's final written determination, including its failure to consider the Payne-based ground of unpatentability.

This Court has jurisdiction to adjudicate this issue, notwithstanding 35 U.S.C. § 314(d).  Section 314(d) prevents interlocutory appellate review of institution decisions before forthcoming final written decisions: "[t]he *determination* by the Director whether to institute an inter partes review *under this section* shall be final and nonappealable" (emphasis added).  Section 314(d) applies only to the Board's discretionary "determination" under section 314,

58

which is whether "there is a reasonable likelihood that the petitioner would prevail" as to at least one claim.  35 U.S.C. § 314(a).  This determination does not insulate from review the PTAB's unreasonable and arbitrary disregard of art via the Redundancy Doctrine that was properly presented in a petition and met the AIA's statutory requirements.  Finally, there is a "strong presumption" against finding that Congress intended to prevent judicial review of agency action.  *Pregis Corp. v. Kappos*, 700 F.3d 1348, 1358 (Fed. Cir. 2012); *see also* Gary Lawson, *Federal Administrative Law*, 955-60 (6th ed. 2013).  Nothing in section 314(d) overcomes this strong presumption or otherwise suggests that the Board has unchecked, unreviewable discretion to unilaterally determine the scope of its authority.

### B.    The Redundancy Doctrine's Inception in *Liberty Mutual*

The Board first articulated its Redundancy Doctrine in *Liberty Mut. Ins. v. Progressive Cas. Ins. Co.*, CBM2012-00003, Paper 7 at 2 (Oct. 25, 2012), in which the petitioner proffered 422 invalidity grounds based on 25 references— 420 obviousness and 2 anticipation.  The Board noted that "numerous redundant grounds would place a significant burden on the Patent Owner and the Board, and would cause unnecessary delays," and thus announced that it was incumbent upon the petitioner to "articulate any relative weakness" and "articulate any

relative strength" among those grounds. *Id.* at 3, 6, 12. The Board allowed the petitioner to either choose a subset of its originally submitted grounds, or the Board would consider only the grounds based on reference with the earliest publication date, irrespective of the relative disclosures. *Id.* at 6-17.

As its authority for pruning the asserted grounds, the Board cited its own regulation 37 C.F.R. § 42.1(b), which states that part 42 of 37 C.F.R. governing Board proceedings, "shall be construed to secure the just, speedy, and inexpensive resolution of every proceeding." *Liberty Mutual,* CBM2012-00003, Paper 7 at 2. The Board also cited to 35 U.S.C. § 326(b), which, in promulgating PGR regulations, directs the PTO to consider "the effect of regulations on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings." *Id.*[15]

Following *Liberty Mutual*, the Board expanded its application of the Redundancy Doctrine.[16] First, the Board applies the Redundancy Doctrine irrespective of the number of grounds asserted and thus irrespective of the

---

[15] The identical language is set forth concerning IPR's at section 316(b).

[16] As of December 31, 2014, a review of the PTAB's Patent Review Processing System showed that the Board has relied on the Redundancy Doctrine to eliminate grounds in scores of IPRs, CBMs, and PGRs. The Board has also referred to redundant grounds as "cumulative" or "duplicative."

relative burden on the Board.  *See Oracle Corp. v. Clouding IP, LLC,* IPR2013-00088, Paper 13 at 5 (June 13, 2013) (rejecting argument that Redundancy Doctrine should apply only where petitioners proffer voluminous invalidity grounds, such as 422 in *Liberty Mutual*).  For example, in *EMC Corp. v. PersonalWeb Techs., LLC*, IPR2013-00087, Paper 5 at 34-54 (Dec. 17, 2012), the petitioner asserted three invalidity grounds based on four references.  The Board instituted on a single ground, denying the other two grounds (and thus two of the four references) as redundant.  *EMC*, IPR2013-00087, Paper 16 at 19 (May 17, 2013).   The Board relied on, *inter alia*, 35 U.S.C. § 316(b), the IPR counterpart to 35 U.S.C. § 326(b) cited in *Liberty Mutual*.  *EMC*, IPR2013-00087, Paper 25 at 2 (June 5, 2013).

Second, the Board applies the Redundancy Doctrine to eliminate entire statutory classes of invalidity grounds.  *See, e.g., Oracle*, IPR2013-00088, Paper 7 at 4, 12-13 (May 14, 2013).  For example, in *Oracle*, the Board instituted IPR on a single anticipation ground, denying as redundant petitioner's two additional obviousness grounds, and thus two of the three asserted prior art references.  *Id.* The Board rejected petitioner's subsequent argument that "an obviousness ground by definition cannot be redundant with an anticipation ground" because they are "premised on different statutory provisions and engender fundamentally

61

different legal standards and analyses," stating "[w]hat matters…is whether Petitioner has articulated meaningful distinction in the potential strength and weaknesses of the applied prior art."  *Oracle*, IPR2013-00088, Paper 13 at 4 (June 13, 2013).

Third, the Board expanded the authority on which it relies for the Redundancy Doctrine to include others of its own regulations, namely 37 C.F.R. §§ 42.100(c) and 42.108.  *See, e.g., EMC Corp.*, IPR2013-00087, Paper 25 at 2-3, and *Oracle*, IPR2013-00088, Paper 13 at 3, respectively.  37 C.F.R. § 42.100(c) states that:

> An inter partes review proceeding shall be administered such that pendency before the Board after institution is normally no more than one year. The time can be extended by up to six months for good cause by the Chief Administrative Patent Judge, or adjusted by the Board in the case of joinder.

37 C.F.R. § 42.108 states that the Board may authorize or deny all or some of the challenged claims and/or asserted grounds in an IPR petition.

## C.    The Board's Redundancy Doctrine is Unlawful

The Board's application of the redundancy doctrine in this case, when subjected to *Chevron* analysis, fails as arbitrary and capricious.  Here, the relevant statutes deny the Board the power to reject asserted grounds under the Redundancy Doctrine as articulated by the Board.  Further, even if this Court

disagrees, the Board's interpretation and application of the relevant regulations are not reasonable and thus entitled to no deference. Finally, APA section 706(A)(2) dictates that the Board's "arbitrary and capricious" adjudication excluding the Payne-based ground should be set aside. In the event this Court does not hold the Interposing Claims invalid over instituted art, Shaw respectfully requests the opportunity to alternatively make its case on these claims with Payne.

### 1.    *Chevron* **Analysis Applies**

To the extent that the Redundancy Doctrine is an interpretation of 35 U.S.C. §§ 316(b) and 326(b), the analysis is guided by *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984), in which the Supreme Court held that, when a court reviews an agency's construction of a statute administered by adjudication, the court must (i) ascertain whether Congress expressed an unambiguous intention regarding the precise question at issue, and, if not, (ii) determine whether the agency's interpretation is reasonable and, therefore, entitled to deference. *See, e.g.*, *Sullivan v. Zebley*, 493 U.S. 521, 528 (1990).

Alternatively, to the extent the Redundancy Doctrine is based on interpretations of 37 C.F.R. §§ 41.100(c), 42.1(b), and/or 42.108, the analysis is guided by *Seminal Rock* deference, *Bowles v. Seminole Rock & Sand Co.*, 325

U.S. 410, 414 (1945), or, as it is now commonly called, *Auer* deference.  *Auer v. Robbins*, 519 U.S. 452, 461 (1997).  However, no practical difference exists between *Chevron* and *Auer* in application.  *See* John F. Manning & Matthew C. Stephenson, *Legislation and Regulation*, 667 (2nd ed. 2013) (noting *Auer* deference is "very similar to" *Chevron* deference); 1 Richard J. Pierce, Jr., *Administrative Law Treatise*, 540 (5th ed. 2010) (noting *Auer* deference is "roughly equivalent to" *Chevron* deference); *Shalala v. Guernsey Mem'l Hosp*., 514 U.S. 87, 94-95 (1995) (deferring to an administrative interpretation of a regulation because it was "reasonable").  The analysis thus proceeds under the *Chevron* framework.

### 2. *Chevron* Step 1: Congress has made plain that the Board cannot reject grounds under its Redundancy Doctrine

35 U.S.C. § 316(b) does not grant the Board the power to reject asserted invalidity grounds under the Redundancy Doctrine in IPRs.  In determining whether Congress has spoken to a particular issue, one must use the "traditional tools of statutory construction."  *Chevron*, 467 U.S. at 843, n.9.  These include the "context" of the allegedly authority-granting statute and the place of the statute in the "overall statutory scheme," *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 132-33 (2000), as well as legislative history.  *E.g., Chevron*, 467 U.S. at 862-64.

64

### i.    *Statutory context dispels the Redundancy Doctrine*

35 U.S.C. §316(d), when considered in the context of the AIA as a whole, shows that Congress did not grant the Board the authority it claims under the Redundancy Doctrine.  For PGRs, Congress authorized the PTO to "take into account whether, and reject a petition or request because, the same or substantially the same prior art or arguments previously were presented to the [PTO]."  35 U.S.C. § 325(d).  Congress did not grant the PTO the same authority for IPRs.  *See* 35 U.S.C. § 315(d).  Further, even this application in PGRs is distinct from the Redundancy Doctrine, as 35 U.S.C. § 325(d) compares a PGR petition's reference to prior art *already considered* by the PTO during prosecution, rather than comparing petition grounds to one another.  By negative implication, this shows that if Congress had intended for the PTO to have the authority the Board claims via the Redundancy Doctrine, it would have made this plain.

### ii.    *The Redundancy Doctrine is inconsistent with the AIA's overall statutory scheme and legislative history*

The Board's application of the Redundancy Doctrine cannot reasonably co-exist with the AIA's estoppel provisions.  On the one hand, the prospect of estoppel unambiguously informed Shaw to put its potentially-winning printed

65

publications on the table, as present law suggests there will be no future opportunity to do so. *See* 35 U.S.C. § 315(e) (estoppel applies to "any ground that the petitioner raised or reasonably could have raised during that inter partes review," applying to post prosecution and district court matters, and attaching after final written decision). On the other hand, the Board's conclusory invocation of the Redundancy Doctrine cast aside Shaw's only section 102 reference to the interposing claims (Payne). In so doing, the Board unreasonably dispensed with Shaw's Payne-based ground, a ground now potentially estopped from future mention.

This approach is wholly inconsistent with Congress's contemplation as to how the PTO should handle petitions when faced with potential backlog. Senator Jon Kyl, when commenting on proposed AIA section 316(b), imparted Congress's unsurprising intent that efficiency shall not be pursued at the expense of the patent system's integrity.

> Similarly, under subsection (a)(2) of sections 316…, the Office is required to implement the inter partes and post-grant review thresholds via regulations, … and under subsection (b) of [section 316], in prescribing regulations, the Office is required to take into account, among other things, the Office's ability "to timely complete proceedings instituted under" those chapters. It is expected that the Office will include in the threshold regulations *a safety valve* that allows the Office to decline to institute further proceedings if a high volume of pending proceedings threatens the Office's ability to timely complete all proceedings. The present

bill's inclusion of this regulations consideration in subsection (b) reflects a legislative judgment that it is better that the Office turn away some petitions that otherwise satisfy the threshold for instituting an inter partes or post-grant review than it is to allow the Office to develop a backlog of instituted reviews that precludes the Office from timely completing all proceedings. *Again*, though, *if the Office rejects a petition on the basis of this subsection (b) consideration, rather than on the basis of a failure to satisfy the substantive standards of the thresholds in section 314…it is expected that Office will make this fact clear* when rejecting the petition.

157 CONG. REC. S1,377 (2011) (emphasis added).  In other words, while Congress contemplated that the PTO may need to turn away petitions because of docket congestion impacting statutory timelines, it expressly advised that the Board recognize such rejections as non-substantive.  (*Id.*)  And the reason given for such non-substantive recognition was so that the petitioners' otherwise "strong invalidity arguments" would not be prejudiced via estoppel:

> Otherwise, even a challenger with strong invalidity arguments might be deterred from using inter partes or post-grant review by fear that his petition might be rejected because of the numerical limit, and the fact of the rejection would then be employed by the patent owner in civil litigation to suggest that the experts at the Patent Office found no merit in the challenger's arguments.

*Id.* at S1,376-77 (discussing permitting the PTO to limit number of granted petitions); *see also* Joe Matal, *A Guide to the Legislative History of the America Invents Act: Part II of II*, 21 Fed. Cir. Bar J. 539, 609 (2012).  Despite this expectation, the Board has rejected few, if any, petitions due to a subsection

67

316(b) "backlog," but has cleaved scores of petitioners' grounds from consideration via the Redundancy Doctrine in its pursuit of efficiency.

Alternatively, if this Court disagrees and finds that Congress has not spoken and precluded rejecting invalidity grounds under the Redundancy Doctrine, then the statutes are necessarily ambiguous on this issue, and the analysis proceeds to the next step in *Chevron*.

3.    ***Chevron* Step 2: The Board's application of the Redundancy Doctrine to exclude the Payne-based ground from its Final Written Decision is not reasonable.**

The Redundancy Doctrine's application is unreasonable against Shaw, if not in all cases.

i.    ***The AIA does not laud efficiency over integrity***

While 35 U.S.C. § 316(b) lists efficiency as a factor the PTO must consider in prescribing regulations, it also lists as a companion consideration— "the integrity of the patent system."  The latter can hardly contemplate the survival of invalid patents in favor of the Board's focus on "timely complet[ion] [of] proceedings."  35 U.S.C. § 316(b).  Similarly, 37 C.F.R. § 42.1(b) requires not only a "speedy," but also a "just" resolution of every proceeding.

Here, the Board has unreasonably sacrificed the AIA's mandate to consider "the integrity of the patent system" in favor of efficiency.  In its zeal to

meet its statutory timelines, it manufactured "efficiencies" beyond those suggested by the AIA, and that were warned against in the AIA's legislative history. The AIA already narrows what would otherwise be an expanded district court dispute by limiting the focus to section 102 and 103 grounds, and only on printed publications relating thereto. 35 U.S.C. § 311(b).

The Board's resort to the Redundancy Doctrine to eliminate the Payne-based ground set a lead block through which the Patent Owner ran its ensnarement and "sharp angles" arguments. By doing so, the Board resuscitated (however, incorrectly) a subset of the patent's claims based on trivial and/or old features.

> ### ii.    *The Board fails to provide reasonable guidance as to an appropriate number of grounds*

Even assuming the Board's authority to promulgate a doctrine weeding out allegedly "redundant" grounds via adjudication, Shaw's reliance on a reasonably small number of grounds and references should have avoided the Board's arbitrary disposal of the Payne-based ground.

The Board originally pointed to the potentially large volume of asserted grounds as the basis for crafting the Redundancy Doctrine, stating that, as to *Liberty Mutual's* 422 grounds and 25 references for 20 claims, "*numerous*

redundant grounds would place a significant burden on the Patent Owner and the Board, and would cause unnecessary delays." *Liberty Mutual*, CBM2012-00003, Paper 7 at 2 (emphasis added). Even assuming Shaw's asserted grounds are "redundant" within the ambiguous meaning ascribed by the Board under its strengths and weaknesses test (which Shaw disputes, see below), Shaw did not assert "numerous" redundant grounds or art; Shaw asserted 7 references and 15 grounds covering 21 claims. (*See* A90.) Further showing Shaw's focused petition, these 7 references are a subset of the 82 references on which it based detailed invalidity contentions targeting the patent in prior district court litigation.[17]

The Board has since backed away from its original expressed concern with the volume of asserted grounds, stating there is "no magic number" of grounds or references that would eliminate or render manageable the Board's burden and the potential resulting delay in review, but rather "the number of grounds presented is [only one] factor in determining redundancy…." *See Oracle*, IPR2013-00088, Paper 13 at 5 (failing to provide other factors). But the

---

[17] Shaw Industries Group, Inc.'s Disclosure of Initial Invalidity Contentions pursuant to LPR 4.3, served Oct. 17, 2012. *ACS v. Shaw*, 1:12-cv-424-RWS (N.D. Ga.), ECF No. 49.

70

Board failed to provide Shaw with any reasonable guidance as to what an appropriate number of grounds or references might be in this specific case.

### iii.    *The strengths and weaknesses test is unreasonable*

The Board's "strengths and weaknesses" requirement is predicated on the fiction that in a petition one could make some objective assessment as to which of multiple grounds are "stronger" or "weaker" than others.  In reality, it has long been customary that accused infringers in District Court cases and PTO reexaminations rely on multiple references supporting parallel grounds of anticipation and obviousness for several reasons.  Some references will oftentimes disclose the limitations directed at the patent's point of novelty, while ignoring discussion of known, older, and/or trivial limitations meriting no express mention to POSITAs.  For those "old" limitations, accused infringers will often rely on other older references from a time when mentioning such limitations was warranted.  Another typical situation occurs where a first reference might address seven limitations of a ten-limitation claim, while another reference addresses different, partially overlapping limitations in that claim.  Similarly, one reference might address claims 1-12 and another reference, claims 8-20.  A "strengths and weaknesses" assessment has no logical

application in such instances; the references work together, each supplying respective portions, including possible overlap, of the invalidity defense.

Further, the "strengths and weaknesses" requirement ignores that at the pre-petition stage of an IPR, claim construction decisions are outstanding and the patent owners' and experts' positions are not yet stated. Until the latter are levied, a petitioner cannot even know what the real dispute will be; before the former are issued, it is often unknowable which references will rise to prominence and which will be rendered less viable.

Skewed from these realities, the Board's "strengths and weaknesses" requirement wrongly suggests a pre-ordained outcome, with 12-18 months of predictable proceedings leading to the "correct" answer. In fact, invalidity arguments start with good faith bases moored to several grounds and references, and then evolve based on the aforementioned events and considerations, leading to the naturally unpredictable impressions of Boards and of Courts who may be persuaded by text, figures, inventor testimony, experts or some varying combination thereof. The IPR's burden of proof itself —invalid by a preponderance of the evidence—makes clear that the end result and the path thereto is largely unknown at the outset and even uncertain in the end.

The Board's "strengths and weaknesses" requirement unreasonably gave Shaw the unprecedented additional undertaking of shouldering the appellee's burden: to rebut Shaw's showing. Shaw satisfied its burden to demonstrate a reasonable likelihood that it would prevail in invalidating a claim, thus warranting IPR institution. It paid its ~$30,000.00 filing fee and reasonably based its petition on a small number of grounds and references given the unknowable future positions, evidence, disputes and rulings and articulated free-standing and non-redundant explanations for each ground. Shaw reasonably expected the Board to render its determination on all such grounds, and was arbitrarily denied that outcome.

Even if the Court finds the Board's strengths and weaknesses test reasonable, Shaw satisfied the same as to the Payne-based ground. Shaw asserted that Payne anticipated the Interposing Claims (ground 11) and, alternatively, Ligon combined with either Munnekehoff or Barmag rendered these claims obvious (grounds 3 and 8). (*See* A90; A105-08; A120-23; A125-34). Despite the Board's decision to the contrary,[18] these are "separate conditions of patentability, requiring different tests and different elements of

---

[18] *See Oracle*, IPR2013-00088, Paper 13 at 4 (June 13, 2013), issued after Shaw filed its petition.

73

proof," *Minkin v. Gibbons, P.C.*, 680 F.3d 1341, 1351 (Fed. Cir. 2012), and thus inherently express relative strengths and weaknesses between the same.

### iv.     *The Redundancy Doctrine is inconsistent with the AIA's estoppel provisions*

As discussed above, the AIA dictates that Shaw's IPR petition was its opportunity to put all potential prior art on the table, lest it be estoped from doing so thereafter.  *See* 35 U.S.C. § 315(e).  The Board's Redundancy Doctrine, casting aside otherwise sound invalidity grounds without substantive review, is inconsistent with these provisions, and thus, for the reasons articulated above, unreasonable.

### 4.     The Redundancy Doctrine is Arbitrary and Capricious

For the same reasons that the Redundancy Doctrine fails *Chevron* Step 2, it is also arbitrary and capricious under 5 U.S.C. § 706(2)(a).  *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs,* 669 F.3d 1340, 1347-1348 (Fed. Cir. 2012) (recognizing overlap between *Chevron* step 2 and the APA); *see also* Pierce at 219 ("It seems apparent that step two of *Chevron* is *State Farm*.").

Shaw does not need to show, and does not portend that there could be, no reasonable application of a doctrine or policy that attempts to manage the

74

Board's docket with the statutorily required timelines.  But, as applied to Shaw, if not as applied to all, the Board's Redundancy Doctrine is not such a reasonable application.  Otherwise, Shaw may be estopped from ever asserting its Payne-based anticipation ground, which was never substantively reviewed, which presents no issues raised by ACS as to combining references (*i.e.*, ensnarement and motivations to combine), and which also shows that the concept of tying four packages together was not novel.

### D.   Alternatively, Shaw should not be estopped from asserting invalidity of the '360 Patent based on the Payne-based ground per section 102

In the event this Court does not invalidate all of the patent's claims, and does not order further IPR proceedings including the Payne-based ground, Shaw requests that it order that Shaw is not estopped from asserting the Payne-based ground in future proceedings, including at district court.

Estoppel applies to "any ground that the petitioner raised or reasonably could have raised during that inter partes review."  35 U.S.C. § 315(e).  The Payne-based ground—ground 11—falls into neither group.  The Payne-based ground was not "raised…during th[e] inter partes review" as it was not a ground upon which IPR was instituted.  Moreover, since the Board (arbitrarily) determined that ground 11 was "redundant" and excluded it from the IPR, it is

75

not the case that Shaw "could have raised" this ground during the IPR. Estoppel, in this context, should be limited, at most, to grounds that a petitioner did not raise in its IPR petition.[19]

The Court should take up this issue now. Not doing so would only result in delaying the inevitable return of the very same issue, on the very same art, after it is asserted at the district court level, alleged to be estopped by the Board's non-meritorious "redundancy" ruling, and appealed on a non-interlocutory basis after resolution. While much unnecessary time will pass and money spent, it is difficult to imagine that any facts will arise between now and then that will change the present question: whether the Board's non-meritorious ruling that art is redundant and thus denied estops Shaw from asserting Payne alone or in combination in district court litigation or other Board proceedings.

---

[19] Analogous issues arise in issue preclusion for which there are several exceptions to the rule precluding relitigation of an issue. *See* Restatement (Second) of Judgments §§ 27, 28(1), (3)-(4) (1982).

## **CONCLUSION**

For all the foregoing reasons, Shaw respectfully requests that this Court reverse the Board's final written decision as to nonobviousness.  Alternatively, Shaw requests that this Court either remand for proper consideration of Payne on the merits, or hold that Shaw is not estopped from asserting grounds and art the Board denied as redundant.

Dated:  January 9, 2015          By: *s/ Thad C. Kodish*

                                  Thad C. Kodish
                                  Erin P. Alper
                                  Fish & Richardson, P.C.
                                  1180 Peachtree Street, N.E., 21st Floor
                                  Atlanta, GA  30309
                                  (404) 892-5005

                                  John A. Dragseth
                                  Fish & Richardson, P.C.
                                  3200 RBC Plaza
                                  60 South Sixth Street
                                  Minneapolis, MN  55402
                                  (612) 335-5070

                                  *Attorneys for Petitioner-Appellant*
                                  *Shaw Industries Group, Inc.*

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper 42
Entered: July 24, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SHAW INDUSTRIES GROUP, INC.,
Petitioner,

v.

AUTOMATED CREEL SYSTEMS, INC.,
Patent Owner.
_____

Cases IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2


Before JOSIAH C. COCKS, JUSTIN T. ARBES, and
BRIAN J. McNAMARA, *Administrative Patent Judges.*

ARBES, *Administrative Patent Judge.*


FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

## I. BACKGROUND

Petitioner Shaw Industries Group, Inc. ("Shaw") filed a Petition in Case IPR2013-00132 (Paper 2, "-132 Pet.") seeking *inter partes* review of claims 1–21 of U.S. Patent No. 7,806,360 B2 ("the '360 patent") pursuant to 35 U.S.C. §§ 311–19.  On July 25, 2013, we instituted an *inter partes* review of claims 1–3 and 5–21 on six grounds of unpatentability (Paper 9, "-132 Dec. on Inst.").  Patent Owner Automated Creel Systems, Inc. ("ACS") filed a Patent Owner Response (Paper 18, "-132 PO Resp."), and Shaw filed a Reply (Paper 25, "-132 Reply").

Subsequent to institution in Case IPR2013-00132, Shaw filed a second Petition in Case IPR2013-00584 (Paper 8, "-584 Pet.") seeking *inter partes* review of claim 4 of the '360 patent.  On December 31, 2013, we instituted an *inter partes* review of claim 4 on two grounds of unpatentability (Paper 16, "-584 Dec. on Inst.").  Shaw's motion for joinder with the first proceeding was denied.  IPR2013-00584, Paper 20.  Given that the second proceeding involves only one claim, however, we set an expedited schedule that would allow the proceedings to proceed in parallel and complete roughly at the same time.  *See* IPR2013-00584, Paper 17.  ACS filed a Patent Owner Response (Paper 23, "-584 PO Resp.") in Case IPR2013-00584, and Shaw filed a Reply (Paper 26, "-584 Reply").

The parties filed motions to exclude in each proceeding, and ACS filed a motion for observation in Case IPR2013-00584, all of which are addressed herein.  An oral hearing was held in both proceedings on May 1, 2014, and a transcript of the hearing is included in the record.  *See* IPR2013-00132, Paper 42 ("Tr."); IPR2013-00584, Paper 43.

2

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

Cases IPR2013-00132 and IPR2013-00584 involve the same
challenged patent and parties, and there is overlap in the asserted prior art
and additional evidence submitted by Shaw.  To administer the proceedings
more efficiently, we exercise our authority under 35 U.S.C. § 315(d) to
consolidate the two proceedings for purposes of issuing one final written
decision.

We have jurisdiction under 35 U.S.C. § 6(c).  This final written
decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Shaw has shown by a
preponderance of the evidence that claims 1–5, 8–12, 14, 19, and 20 of the
'360 patent are unpatentable, but has not shown by a preponderance of the
evidence that claims 6, 7, 13, 15–18, and 21 are unpatentable.

## A. The '360 Patent

The '360 patent[1] relates to "creels used for supplying stranded
materials" (e.g., yarn used for making textiles) to a machine for "subsequent
treatment" or the "fabrication of articles" from the stranded materials.
Ex. 1002, col. 1, ll. 14–17.  The '360 patent describes how high-speed
processing systems require a continuous, uninterrupted stream of stranded
material fed from multiple yarn packages throughout a creel, but loading and
maintaining a full creel "remains an extremely labor intensive operation"
and can cause breaks in the material, particularly at the point where material
from successive packages is joined.  *Id*. at col. 1, ll. 30–44.  The '360 patent

---

[1] The '360 patent issued based on U.S. Patent Application No. 12/253,398,
filed on October 17, 2008, which is a continuation-in-part of U.S. Patent
Application No. 11/875,254, filed on October 19, 2007, and issued as
U.S. Patent No. 7,802,749.

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

describes a mechanism that provides a "pre-configured supply of materials, carried on movable carts, or cartridges," for loading into a creel. *Id*. at col. 2, ll. 36–46.

Figure 12 of the '360 patent is reproduced below.



As shown in Figure 12 above, two carts 140 on either side of creel magazine frame 121 are loaded with three levels of stranded material packages 30 (two packages on each level). *Id*. at col. 8, ll. 32–52. Packages 30 are supported on support arms 144. *Id*. at col. 8, ll. 55–67. One continuous feed of stranded material is provided at a particular level by connecting the end of the material in one package to the beginning of the material in the next package and drawing material from the four packages at the level sequentially. *Id*. at col. 9, l. 64–col. 10, l. 16; Fig. 13 (depicting stranded material portions a–f from packages 30a–d used in sequence). The '360 patent also describes a replacement method whereby the empty packages in one cart are replaced while the packages in the opposite cart are being used,

4

and then the carts alternate roles when the opposite packages in turn are depleted. *Id*. at col. 7, l. 45–col. 8, l. 52; col. 11, l. 1–col. 12, l. 16. A cart or package is "active" (when it is being used) or "ready" (when it has been replenished and is awaiting use). *Id*. at col. 11, l. 65–col. 12, l. 9. Carts 40 have wheels 42 and are positioned at the appropriate distance from creel magazine 120 via pin 146 placed in track 148. *Id*. at col. 4, ll. 22–25; col. 9, ll. 1–13.

As shown in Figure 12, creel magazine 120 includes on each level ring guide 70 for routing the stranded material as it is drawn from packages 30. *Id*. at col. 9, ll. 14–63. Figure 19A depicts ring guide 70 in further detail, and is reproduced below:



As shown in Figure 19A above, ring guide 70 comprises a lower ring having annular turning surface 73 and an upper ring having upper turning surface 74. *Id*. at col. 9, ll. 22–37. The ring shape of annular turning surface 73

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

allows the surface to receive stranded material from any direction (i.e., any of the four packages at that level) and control "ballooning"[2] when "the strands transfer across the magazine frame 121 from one cart to the other." *Id*. at col. 5, ll. 51–61; col. 9, ll. 49–59. As stranded material is drawn out of a package, annular turning surface 73 changes the orientation of the material from horizontal to vertical, upper turning surface 74 changes it back to horizontal, secondary guide 27 (shown in Figure 12) changes it to vertical, and guide board 12 (shown in Figure 12) changes it to horizontal so that it can be processed along with the material from other magazines. *Id*. at col. 6, ll. 59–63; col. 9, l. 49–col. 10, l. 16; Figs. 16A–B.

### B. Illustrative Claims

Claims 1–6 of the '360 patent recite (paragraphing added):

1. A creel magazine for feeding stranded material to a manufacturing process comprising:

a magazine having a stationary magazine frame comprising a common guide for said stranded material;

a first and a second removable cartridge positioned adjacent said magazine frame on respective opposite sides of said frame, said first removable cartridge having at least one support arm supporting an active package of stranded material thereon;

said second removable cartridge having at least one support arm supporting a ready package of stranded material thereon;

---

[2] The '360 patent describes the problem of "ballooning" as follows: "As will be recognized by those skilled in the art, particularly with respect to stranded materials such as yarns utilized in textiles, as the yarn is pulled from the package 30, it will unwind from package 30 and form a balloon around and at the end of the package 30." Ex. 1002, col. 5, ll. 51–55.

6

wherein a trailing end of said active package is connected to a leading end of said ready package such that said stranded material is sequentially and continuously fed to said common guide from said active package then from said ready package.

2. The creel magazine of claim 1, wherein said common guide is an annular turning surface positioned to receive stranded material fed from said active package.

3. The creel magazine of claim 2, wherein said common guide further comprises an upper turning surface supported above said annular turning surface.

4. The creel magazine of claim 3, wherein said annular turning surface and said upper turning surface are separated by a distance corresponding to the diameter of said packages.

5. A creel magazine for feeding stranded material to a manufacturing process comprising:

a magazine having a stationary magazine frame comprising a common guide for said stranded material;

a first and a second removable cartridge positioned adjacent said magazine frame on respective opposite sides of said magazine frame, said first removable cartridge having at least one support arm supporting an active package of stranded material thereon;

said second removable cartridge having at least one support arm supporting a ready package of stranded material thereon wherein a trailing end of said stranded material carried by said active package is connected to a leading end of said stranded material carried by said ready package;

wherein said common guide is an annular turning surface and said stranded material is sequentially fed to said common guide from said active package then from said ready package.

6. The creel magazine of claim 5, further comprising an additional support arm supported adjacent to said at least one support arm for supporting an additional ready package on said first removable cartridge, to be selectively interposed between said active package and said ready package on said second removable cartridge to feed said stranded material.

7

*C. Prior Art*

The pending grounds of unpatentability in the instant *inter partes* reviews are based on the following prior art:

1. U.S. Patent No. 3,102,702, issued Sept. 3, 1963 ("Miller") (Ex. 1012);[3]

2. U.S. Patent No. 4,572,458, issued February 25, 1986 ("Bluhm") (Ex. 1111).

3. U.S. Patent No. 5,624,082, issued April 29, 1997 ("Ligon") (Ex. 1010);

4. German Patent Application Publication No. DE 3429153 A1, published Feb. 28, 1985 ("Münnekehoff") (Ex. 1005); and

5. German Patent DE 7413531, published July 31, 1975 ("Barmag") (Ex. 1007).[4]

*D. Pending Grounds of Unpatentability*

The instant *inter partes* reviews involve the following grounds of unpatentability:

---

[3] Shaw numbered its exhibits in Case IPR2013-00132 as 1001–1017, and its exhibits in Case IPR2013-00584 as 1101–1119. ACS numbered its exhibits in Case IPR2013-00132 as 2001–2005 and 2300, and its exhibits in Case IPR2013-00584 as 2101, 2102, 2301, and 2401. We use the parties' numbering, and refer to exhibit numbers without their corresponding case number for simplicity.

[4] We refer to "Münnekehoff" as the English translation (Ex. 1005) of the original reference (Ex. 1004), and likewise refer to "Barmag" as the English translation (Ex. 1007) of the original reference (Ex. 1006). Shaw provided affidavits attesting to the accuracy of the translations. *See* Exs. 1005, 1007; 37 C.F.R. § 42.63(b).

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

| Reference(s) | Basis | Claim(s) |
|---|---|---|
| Münnekehoff | 35 U.S.C. § 102(b) | 1–3, 5, 8–10, 12, 14, 19, and 20 |
| Münnekehoff and Ligon | 35 U.S.C. § 103(a) | 6, 7, 13, 15–18, and 21 |
| Münnekehoff and Miller | 35 U.S.C. § 103(a) | 11 |
| Münnekehoff and Bluhm | 35 U.S.C. § 103(a) | 4 |
| Barmag | 35 U.S.C. § 102(b) | 1–3, 5, 8–10, 12, 14, 19, and 20 |
| Barmag and Ligon | 35 U.S.C. § 103(a) | 6, 7, 13, 15–18, and 21 |
| Barmag and Miller | 35 U.S.C. § 103(a) | 11 |
| Barmag and Bluhm | 35 U.S.C. § 103(a) | 4 |

## II. ANALYSIS

### A. Claim Interpretation

In the Decisions on Institution, we interpreted various claim terms of the '360 patent as follows:

| Term(s) | Interpretation |
|---|---|
| "cart" and "cartridge" (claims 1, 5, 8, 12, and 14) | a small wheeled vehicle |
| "removable" (claims 1, 5, and 14) | capable of being removed |
| "annular turning surface" (claims 2 and 5) | a ring-shaped surface that changes the direction of stranded material |
| "upper turning surface" (claim 3) | a surface, located above another surface, that changes the direction of stranded material |

9

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

| Term(s) | Interpretation |
|---|---|
| "distance corresponding to the diameter of said packages" (claim 4) | a distance that is derived from the diameter of a fully loaded package |
| "ring guide" (claim 9) | a guide structure having a circular shape |

*See* -132 Dec. on Inst. 8–16; -584 Dec. on Inst. 9–11. The parties do not dispute these interpretations in their Patent Owner Responses and Replies, and we incorporate our previous analysis for purposes of this decision.

### B. Claims 1–3, 5, 8–12, 14, 19, and 20

Shaw argues in its Petition in Case IPR2013-00132 that (1) claims 1–3, 5, 8–10, 12, 14, 19, and 20 are anticipated by Münnekehoff under 35 U.S.C. § 102(b); (2) claim 11 is unpatentable over Münnekehoff and Miller under 35 U.S.C. § 103(a); (3) claims 1–3, 5, 8–10, 12, 14, 19, and 20 are anticipated by Barmag under 35 U.S.C. § 102(b); and (4) claim 11 is unpatentable over Barmag and Miller under 35 U.S.C. § 103(a). -132 Pet. 9–16, 22–31, 37–38. Shaw's allegations are supported by testimony from Youjiang Wang, Ph.D. *See* Ex. 1001. ACS, in its Patent Owner Response in Case IPR2013-00132, does not provide any argument regarding claims 1–3, 5, 8–12, 14, 19, and 20, and instead focuses solely on claims 6, 7, 13, 15–18, and 21. *See* -132 PO Resp. 12. We have reviewed Shaw's Petition and the evidence cited therein, and are persuaded, by a preponderance of the evidence, that claims 1–3, 5, 8–12, 14, 19, and 20 are unpatentable based on the asserted grounds identified above.

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

## C. Claims 6, 7, 13, 15–18, and 21

Shaw argues in its Petition in Case IPR2013-00132 that claims 6, 7, 13, 15–18, and 21 are unpatentable under 35 U.S.C. § 103(a) based on two combinations of references: (1) Münnekehoff and Ligon, and (2) Barmag and Ligon. -132 Pet. 18–21, 33–36. Shaw again relies on the testimony of Dr. Wang in support. *Id.* (citing Ex. 1001 ¶¶ 28–33, 55–59). We have reviewed Shaw's Petition, ACS's Patent Owner Response, and Shaw's Reply, as well as the evidence discussed in each of those papers. We are not persuaded, by a preponderance of the evidence, that claims 6, 7, 13, 15–18, and 21 are unpatentable based on either asserted ground.

### 1. Level of Ordinary Skill in the Art

Neither party expressly states what it believes to be the level of ordinary skill in the art applicable to the '360 patent. Based on our review of the '360 patent, the types of problems and solutions described in the '360 patent and cited prior art, and the testimony of the parties' declarants,[5] we conclude that a person of ordinary skill in the art at the time of the '360 patent (October 2008) would have had a degree in mechanical engineering or a similar discipline, and multiple years of work experience with creels. *See, e.g.*, Ex. 1002, col. 1, l. 14–col. 2, l. 32 (stating that the '360 patent relates to "creels used for supplying stranded materials," and describing conventional creel systems of the time and problems with such systems, including problems with strand breakage and manual replacement of yarn

---

[5] Shaw submitted testimony from Dr. Wang in each proceeding. *See* Exs. 1001, 1013, 1101, 1116. ACS submitted testimony from David Chadwick, the named inventor of the '360 patent, and David Brookstein, Sc.D. *See* Exs. 2001, 2101, 2102.

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

packages); Ex. 1001 ¶¶ 3–7 (describing the background of Dr. Wang);
Ex. 2001 ¶¶ 1–8 (describing the background of Mr. Chadwick); Ex. 2102
¶¶ 2–5 (describing the background of Dr. Brookstein).

### 2. Ground Based on Münnekehoff and Ligon
#### a. Münnekehoff

Münnekehoff discloses a "[t]extile machine for the processing of
thread" where each creel comprises a "stock section" and "standby section"
with bobbins.  Ex. 1005, Abstract.  A "stock" bobbin supplies thread during
operation, and a "standby" bobbin is connected at its "outermost thread end"
to the "innermost thread end" of a stock bobbin.  *Id*. at p. 5, ll. 3–21.[6]  Doing
so allows "continuous operation" where the thread runs from the standby
bobbin once the stock bobbin is depleted and "the standby bobbin [then]
becomes the stock bobbin, while the empty sleeve of the previous stock
bobbin is removed from the creel and replaced with a new standby bobbin."
*Id*. at p. 5, ll. 21–28.

---

[6] When citing Münnekehoff, we refer to the page numbers in the header of
the translation (Ex. 1005).

12

Figure 2 of Münnekehoff is reproduced below.



Figure 2 depicts a creel arrangement comprising bobbin holders 29, stock section 8 with stock bobbins 10 providing run-off thread 12, and standby section 9 with standby bobbins 11 providing standby thread 17. *Id.* at p. 11, l. 7–p. 12, l. 1; pp. 15–16. As shown in Figure 2, inner thread end 18 of stock bobbin 10 at each level is looped around holding rod 19 on stock section 8, and "connected, e.g. knotted," to outer thread end 37 of standby bobbin 11 when a new standby bobbin is installed. *Id.* at p. 13, ll. 7–12.

13

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

Further, "the operator is able to grasp the thread ends 18 on the holding rods 19 of the stock section 8, and connect the ends of the threads of one standby and one stock bobbin each." *Id*. at p. 13, ll. 13–20. Figure 2 also depicts inner thread end 18 of standby bobbin 11 "pre-positioned" at holding rod 19 on standby section 9. *Id*. at p. 11, ll. 18–24.

The arrangement shown in Figure 2 includes thread guiding tube 21 for each level of bobbins (four are shown in Figure 2). *Id*. at p. 11, ll. 26–32. Thread guiding tubes 21 each include a balloon thread guide 14 at the "mouth" where the thread enters, and are used to guide the thread from the bobbins up and to the side of the machine. *Id*.; Fig. 2 (depicting a 90-degree turn at the top of the figure). Support frames 32 for each section (stock and standby) have wheels at the top for moving along rails 33. *Id*. at p. 12, l. 29–p. 13, l. 6.

### b. Ligon

Ligon discloses a "yarn creel for feeding yarn to an associated textile machine having a generally in-line yarn delivery path." Ex. 1010, col. 2, ll. 5–8. Ligon states that as looms began operating at higher speeds, tying two yarn packages together became insufficient, and those in the textile industry began using creels with four yarn packages tied together instead. *Id*. at col. 1, ll. 25–28. Using four packages, however, required multiple changes in direction as the yarn is fed horizontally from the packages to the loom and other machinery, which could result in the yarn breaking and interrupting the textile process. *Id*. at col. 1, ll. 32–40. Specifically, "[e]ach time that the yarn changes its direction, particularly sharply, the chances of a yarn break are greatly increased because of the increased tension resulting

14

from increased angles." *Id*. at col. 1, ll. 35–38.  Ligon addresses this
problem by "mount[ing] four yarn packages tailed together to feed yarn to a
single associated textile machine generally in-line with the machine with
reduced bends in the yarn delivery path." *Id*. at col. 2, ll. 24–26.  Figure 2 of
Ligon is reproduced below.



*Fig.2*

Figure 2 depicts four yarn packages 16a–d on yarn package holders 28 that
feed weft yarn 10 to a single eyelet 42.  *Id*. at col. 4, ll. 22–27.  Yarn
packages 16a–d are tailed together, at point 17 of each package, such that
yarn is fed sequentially through the four packages from 16a to 16d to 16c to
16b, as shown in Figure 2.  *Id*. at col. 3, ll. 55–63; Figs. 2, 4.  Ligon also
discloses an arrangement with four vertically-spaced, "side-by-side" pairs of

15

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

yarn packages, where each pair is tailed together and fed to its own vertically-spaced eyelet. *Id*. at col. 5, ll. 2–14.

### c. Analysis

Claims 6, 7, 13, 15–18, and 21 each recite the transfer of stranded material from one package to another in two ways:  on the same side of the magazine frame, and across the frame.  The claims from which these claims depend, by contrast, recite only transfer across the frame.  For example, independent claim 5 recites an across-frame transfer where the active package is on the first removable cartridge, the ready package is on the second removable cartridge, and the "trailing end of said stranded material carried by said active package is connected to a leading end of said stranded material carried by said ready package" (on the "opposite side[]" of the frame).  Claims 6 and 7, which depend from claim 5, add the feature of same-side transfer.  Claim 6 recites an "additional ready package on said first removable cartridge, to be selectively interposed between said active package and said ready package."  Claim 7 similarly recites an "additional ready package on said second removable cartridge to be selectively interposed between said active package . . . and said ready package."

16

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

ACS provides, on page 15 of its Patent Owner Response, the following annotated version of Figure 12 of the '360 patent to illustrate how the claimed transfers work.



In the annotated Figure 12 above, the top level depicts the additional ready package on the first cartridge interposed between the active package and ready package (claim 6), and the middle level depicts the additional ready package on the second cartridge interposed between the active package and ready package (claim 7). ACS's annotated figure above accurately reflects the same-side and across-frame transfers recited in claims 6 and 7. Claims 13, 15–18, and 21 also recite both types of transfer, via "interpos[ing]" or "interconnecting" an additional package on one or both sides of the frame.[7]

Turning to the allegations in Shaw's Petition, Shaw relies on Münnekehoff as teaching all of the limitations of the claims from which claims 6, 7, 13, 15–18, and 21 depend. *See* -132 Pet. 9–16. As shown in Figure 2 above, Münnekehoff has one stock bobbin and one standby bobbin

---

[7] Although we refer primarily to the language of claims 6 and 7 for convenience, our analysis applies equally to claims 13, 15–18, and 21.

at each level, on either side of the frame.  The tail end of the stock bobbin is connected to the lead end of the standby bobbin to allow for "continuous operation."  Ex. 1005, p. 5, ll. 21–28.  ACS does not dispute that Münnekehoff teaches all of the limitations of the parent claims of claims 6, 7, 13, 15–18, and 21, including the across-frame transfer.

What Münnekehoff lacks, however, is the same-side transfer from one bobbin to another on one side of the frame.  Shaw relies on Ligon as teaching this limitation.  Shaw contends that Münnekehoff's single bobbin on either side of the frame could be replaced with a pair of bobbins, as taught by Ligon, which would allow "runtime per side [to be] lengthened." -132 Pet. 18–21.  Dr. Wang testifies in his declaration filed with Shaw's Petition that the package arrangement in Münnekehoff "lends itself to the interposing arrangement" of Ligon for same-side transfers prior to across-frame transfers, and cites the Specification of the '360 patent for the proposition that "the tying together of neighboring packages to obtain longer, continuous run time is well-known and widely used in the industry." Ex. 1001 ¶ 32 (citing Ex. 1002, col. 1, l. 66–col. 2, l. 3; col. 6, ll. 52–55). Dr. Wang further testifies as follows:

> [C]onsistent with the widespread and longtime use of tying together neighboring packages, modifying the creel structures to accommodate additional pegs and associated packages to creels is commonly used in the industry to achieve manufacturer needs, as well as product specifications and utilized materials.  Applying common sense, a person of ordinary skill in the art would have replaced one of the bobbins in Munnekehoff with a pair of bobbins as in Ligon [] to obtain predictable desired results, such as longer, continuous run time between transfers.  This change would have been motivated by numerous manufacturing benefits, for example, the doubling of runtime for each removable section before it has to be replaced.

18

*Id.* ¶ 33.

Based on our review of Shaw's contentions and supporting evidence, as well as ACS's arguments in response, we are not persuaded that claims 6, 7, 13, 15–18, and 21 would have been obvious based on the combination of Münnekehoff and Ligon for two reasons.

### i. Operability of Münnekehoff-Ligon Combination

First, merely adding a second bobbin to each side of the frame in Münnekehoff, as Shaw proposes in the Petition, would result in an inoperable assembly. ACS correctly points out in its Patent Owner Response that because the Münnekehoff assembly has structures in the middle of the assembly between the two cartridges, "[a]fter a single rotation of packages, the guide tubes would become ensnared and the process would have to stop." -132 PO Resp. 30–32. According to ACS, "[t]he only way this could be avoided is to completely redesign Münnekehoff so that the strands no longer travel upward [in the thread guiding tubes] through the next level." *Id.* at 30. We agree.

Münnekehoff describes an assembly with multiple levels, and a bobbin on either side of the frame at each level. Figure 2 of Münnekehoff shows column 20 with thread guiding tubes 21 between stock section 8 and standby section 9. Figure 4 shows a thread guiding tube for each level. If Münnekehoff had two bobbins on either side rather than one, as Shaw proposes, thread would be pulled in a circular manner (same-side, then across the frame, then same-side, then across the frame again). Doing so would cause the yarn to wrap around the middle column and yarn guiding tubes after the first rotation.

19

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

ACS's position is supported by the testimony of Mr. Chadwick, who explains how the thread would be ensnared and provides the following annotated version of Figure 4.



Ex. 2001 ¶ 59. The annotated Figure 4 above shows how thread would be pulled in a circular manner from one package to the next and become tangled around the thread guiding tubes. Further, although only illustrative, ACS provided at the hearing a sequence of demonstrative exhibits showing the rotation and how the tangling would occur. *See* Ex. 2005 at 8–17; Tr. 50:1–56:17. ACS also correctly argues that Münnekehoff uses holding rods 19 to hold the thread on either side of the frame, and Shaw provides no explanation in the Petition as to how such an arrangement would be modified to account for multiple bobbins on either side, as allegedly taught by Ligon. *See* -132 PO Resp. 25–27; Ex. 2001 ¶ 56.

20

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

ACS's argument that Shaw's proposed modification to the
Münnekehoff assembly would not work (absent major changes to the
assembly to prevent the tangling) is persuasive. "If references taken in
combination would produce a 'seemingly inoperative device,' . . . such
references teach away from the combination and thus cannot serve as
predicates for a prima facie case of obviousness." *McGinley v. Franklin
Sports, Inc.*, 262 F.3d 1339, 1354 (Fed. Cir. 2001) (citation omitted); *see
also In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1382 (Fed. Cir.
2007) ("a reference teaches away from a combination when using it in that
combination would produce an inoperative result," but the obviousness
analysis must account for "modifications that one skilled in the art would
make to a device borrowed from the prior art"); *In re Gordon*, 733 F.2d 900,
902 (Fed. Cir. 1984) (finding no reason to modify a prior art device where
the modification would render the device "inoperable for its intended
purpose").

We agree that a person of ordinary skill in the art would not have been
led to make the proposed change to Münnekehoff—adding a second bobbin
to each side—due to the tangling that would result from the change. Further,
although Shaw is correct that overall "runtime" (i.e., the time when thread
may be pulled without having to replace packages) would be increased by
adding a second bobbin to each side, *see* -132 Pet. 19, we do not agree that a
skilled artisan would have had adequate reason to combine the references
due to the inoperability of the modified assembly. For similar reasons, we
are not persuaded by Dr. Wang's testimony that the combination of
Münnekehoff and Ligon would have been "common sense" and would have
achieved "predictable desired results." *See* Ex. 1001 ¶ 33. Because the

21

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

proposed combination would be inoperable, Shaw's analysis does not amount to "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quotations and citation omitted).

In its Reply, Shaw argues that it was within the skill set of a person of ordinary skill in the art to "select/adjust yarn paths in a manner that avoids ensnarement." -132 Reply 14. As support, Shaw cites a reply declaration from Dr. Wang describing two possible ways in which ensnarement allegedly could be avoided. Ex. 1013 ¶¶ 28–30. Dr. Wang provides the following diagrams.



Example 1                    Example 2

*Id.* ¶ 28. Example 1 above involves adding a tube Q to the assembly to prevent ensnarement after the first rotation A, and Example 2 involves reversing the sequence of packages after the first rotation A. *Id.*

None of the analysis in Dr. Wang's reply declaration, however, was included with Shaw's Petition. *See* 37 C.F.R. § 42.23(b); Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions; Final Rule, 77 Fed. Reg. 48,612, 48,620 (Aug. 14, 2012) ("Oppositions and replies may rely upon appropriate

22

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

evidence to support the positions asserted. Reply evidence, however, must be responsive and not merely new evidence that could have been presented earlier to support the movant's motion."); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012) ("While replies can help crystalize issues for decision, a reply that raises a new issue or belatedly presents evidence will not be considered and may be returned. . . . Examples of indications that a new issue has been raised in a reply include new evidence necessary to make out a *prima facie* case for the patentability or unpatentability of an original or proposed substitute claim, and new evidence that could have been presented in a prior filing."). The modification to Münnekehoff proposed in the Petition was only to add a second bobbin on either side of the frame, *see* -132 Pet. 18–21, but Dr. Wang now proposes making different changes to allow Münnekehoff to be combined with Ligon. During the hearing, Shaw acknowledged that Ligon's teaching of two bobbins on one side of the frame could not just be inserted into the Münnekehoff assembly, and that some changes would be necessary to combine the two references. Tr. 17:14–20. Shaw does not provide any reason, however, as to why the changes proposed in its Reply could not have been discussed earlier in the Petition.

Even if Dr. Wang's new analysis had been included in the Petition, though, we do not find it persuasive. The use of tube Q, shown in the diagrams above, is not disclosed in the cited references. Dr. Wang does not provide any basis (in Ligon or otherwise) for adding the additional tube to the Münnekehoff assembly in the manner proposed, or cite anything in the references indicating that the rotation of packages should be reversed after one sequence. Indeed, the opposite appears to be the case. Because the

23

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

packages on one side of the frame would be replenished while thread is being pulled from the packages on the other side, a person of ordinary skill would not want to reverse the rotation and immediately begin pulling thread from a recently depleted package. *See* Ex. 1005, p. 5, ll. 26–28; p. 6, ll. 7–9; p. 7, ll. 12–15.

Shaw also argues in its Reply that no entanglement would occur in a system with only one level, and that Münnekehoff "contemplates reconfiguring the packages." -132 Reply 14–15 (citing Ex. 1013 ¶ 26; Ex. 1005, p. 6, l. 34–p. 7, l. 2). Every embodiment described in Münnekehoff, however, has multiple levels, and the Münnekehoff assembly also includes a column for the thread guiding tubes between the cartridges on either side, which would cause entanglement in the middle of the assembly as well. Further, the portion of Münnekehoff cited by Shaw only describes reconfiguring the pegs for holding the bobbins, not reconfiguring the number of bobbins, the sequence of bobbins from which thread is pulled, or the way in which thread is pulled from the bobbins. *See* Ex. 1005, p. 6, l. 34–p. 7, l. 2.

Finally, Shaw contends that Mr. Chadwick's testimony should be given little weight because he is the named inventor on the '360 patent and the president and sole owner of ACS, and because Mr. Chadwick's testimony regarding "interposing" conflicts with prior testimony he gave in the related district court action between the parties, *Automated Creel Systems, Inc. v. Shaw Industries Group, Inc.*, N.D. Ga. Case No. 1:12-cv-00424-RWS. -132 Reply 2–3 (citing Ex. 1015 at 172:4–11). We have taken into account Mr. Chadwick's connection with ACS in evaluating ACS's arguments, and conclude that his testimony provides some support

24

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

for the logical entanglement argument made by ACS in its Patent Owner Response.  Further, we rely on our own analysis of the "interposing" language of the claims, as set forth above, and do not observe any conflict between Mr. Chadwick's previous testimony (regarding claim 6 of the '360 patent) and his testimony regarding entanglement in the Münnekehoff system if combined with Ligon.

### ii. Reasons to Combine Münnekehoff and Ligon

Second, a person of ordinary skill in the art would not have been motivated to combine Münnekehoff with Ligon because Münnekehoff uses multiple sharp turns in guiding thread from the bobbins, and Ligon discourages the use of sharp turns.  *See* -132 PO Resp. 17–21.  As shown in Figure 2 of Münnekehoff, thread from a package enters balloon thread guide 14 horizontally, undergoes a 90-degree turn to vertical through thread guiding tube 21, then again undergoes a 90-degree turn at the top of thread guiding tube 21 to horizontal.  Ex. 1005, p. 11, ll. 26–32.  Ligon discloses that sharp changes in direction for yarn packages are "a problem to which considerable attention may be given."  Ex. 1010, col. 1, ll. 46–50.  Specifically, "[e]ach time that the yarn changes its direction, *particularly sharply*, the chances of a yarn break are greatly increased because of the increased tension resulting from *increased angles*."  *Id*. at col. 1, ll. 32–38 (emphasis added).  Thus, Ligon's assembly uses a "relatively straight in-line yarn delivery path in which yarn bends and changes in direction are minimized."  *Id*. at col. 1, ll. 4–10; col. 1, ll. 55–58; col. 2, ll. 5–8 ("a generally in-line yarn delivery path"); col. 2, ll. 23–26 ("reduced bends in the yarn delivery path").

25

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

The "in-line" yarn delivery path in Ligon is shown in Figure 1 below.



Figure 1 depicts thread being guided through yarn eyelet assembly C and yarn accumulator 12 in a generally horizontal manner, at angles greater than 90 degrees. *See id.* at col. 3, ll. 55–63. ACS contends that a person of ordinary skill in the art would not have thought to combine Münnekehoff and Ligon due to Münnekehoff's use of 90-degree turns and Ligon's express teaching that sharp turns should be avoided. -132 PO Resp. 17–21. Again, ACS's arguments are supported by Mr. Chadwick's explanation of the references, and we find them persuasive. *See* Ex. 2001 ¶¶ 38–47.

Shaw responds that ACS ignores the "similarity in yarn bends" between Münnekehoff and Ligon, pointing out that Figure 1 of Ligon and Figure 2 of Münnekehoff both show three turns in the yarn path. -132 Reply 5–7. As described in Ligon, however, it is the "increased angles" of "particularly sharp[]" turns that are of concern, not necessarily the number of turns overall. *See* Ex. 1010, col. 1, ll. 32–38.

26

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

Shaw also argues, citing Dr. Wang's reply declaration, that the angle between yarn package 16c and yarn eyelet assembly C in Figure 1 of Ligon "approaches 90 degrees," and Ligon "contemplates sharper turns by moving the front frame 18 toward the rear frame 20 . . . to accommodate weak yarn, which would, consequently, result in a sharper turn" at that angle. -132 Reply 8 (citing Ex. 1010, col. 5, ll. 24–30; Ex. 1013 ¶ 18). Shaw's arguments are not persuasive. As shown in Figure 1 of Ligon above, the angle at issue appears to be closer to 135 degrees than 90 degrees. Further, Ligon discloses that as front frame section 18 is moved toward rear frame section 20, it is "necessary" to adjust lower yarn packages 16c and 16d by moving lower adjustable mounts 32 and yarn holders 28c. Ex. 1010, col. 5, ll. 24–43. Thus, although Shaw is correct that front frame section 18 may be moved toward rear frame section 20 in Ligon (which would otherwise decrease the angle between yarn package 16c and yarn eyelet assembly C), Shaw does not account for the fact that a corresponding adjustment would be made in the level of yarn package 16c.

Finally, Shaw contends that even if Ligon's desire for an "in-line" yarn delivery path was inconsistent with the 90-degree turns in Münnekehoff, a person of ordinary skill in the art would be motivated to combine the references because Ligon discloses other "aspects," such as being able to switch between a two-package and four-package arrangement, and objectives other than minimizing yarn breakage through "in-line" delivery. -132 Reply 8–10. None of these arguments, however, disproves the fact that Ligon expressly discourages the type of sharp turns that are present in Münnekehoff, or shows that a skilled artisan would have disregarded that inconsistency in assessing the references. We also disagree

27

with Shaw's reading of Ligon.  Throughout its description of the
"Background of the Invention," Ligon describes as its primary objective
minimizing sharp changes in direction with an "in-line" path to prevent the
yarn from breaking.  *See* Ex. 1010, col. 1, l. 4–col. 2, l. 2.  Using 90-degree
turns, as in Münnekehoff, is inconsistent with that goal.

Therefore, we are not persuaded that a person of ordinary skill in the
art would have looked to Ligon to modify the assembly of Münnekehoff.

### 3. Ground Based on Barmag and Ligon

#### a. Barmag

Barmag discloses a "feeding bobbin creel for textile machines" that
provides "continuous thread take-off" through the use of both active and
"reserve" bobbins.  Ex. 1007 ¶¶ 1–2.  Specifically, "the yarn end wound up
in a yarn reserve of a presented bobbin is connected to the beginning of the
thread of the reserve bobbin that is also mounted on the warping creel" and,
"[a]fter the presented bobbin is unwound and now the reserve bobbin is
presented, the bobbin that became empty is replaced with a full bobbin,
which then serves as a reserve bobbin."  *Id.* ¶ 2.

28

Figure 1 of Barmag is reproduced below.



Figure 1 depicts a creel arrangement comprising arbors 18 for holding
bobbins, creel carriage 6 with active bobbins 26a–30a, and creel carriage 7
with reserve bobbins 26b–30b.  *Id*. ¶¶ 13–14.  The arrangement also includes
thread guide support 34 with a "thread guide for each pair of co-operating
bobbins" (e.g., thread guide 35 for bobbins 26a and 26b).  *Id*. ¶ 15.  In the
embodiment shown in Figure 1, the thread guides are "inlet openings" of
thread guide tubes 40–44, which guide the thread coming from the bobbins.
*Id*.  Barmag also discloses that "thread guide eyelets" can be used instead of
thread guide tubes, and in that scenario, thread guide eyelets would be
positioned in the "deflection points of the thread path and on the cross

29

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

member 46 of the support frame 45, 46." *Id.* Creel carriages 6/7 also have wheels 8 for moving on rails 9 on the floor of a facility. *Id.* ¶¶ 13–14.

### b. Analysis

The creel arrangement disclosed in Barmag is very similar to the one disclosed in Münnekehoff. Both references disclose packages on multiple levels, with one package on either side of the frame at each level, and both references disclose multiple 90-degree turns in the tubes that guide the thread. The parties' arguments regarding Barmag in combination with Ligon, as well as the testimony of Dr. Wang and Mr. Chadwick, are nearly identical to the arguments and testimony regarding Münnekehoff and Ligon. *See* -132 Pet. 33–36; -132 PO Resp. 37–55; -132 Reply 15.

For similar reasons to those set forth above, we agree with ACS that Shaw's proposed modification of adding a second bobbin to either side of the frame in Barmag would, absent a significant redesign, result in entanglement around thread guide support 34 and thread guide tubes 40–44. *See supra* Section II.C.2.c.i; -132 PO Resp. 47–48, 50–54. We also agree with ACS that such entanglement would occur even if Barmag used "thread guide eyelets" (rather than tubes) because the eyelets still must be supported by thread guide support 34 in the middle of the frame, and the thread would wrap around that support. *See* -132 PO Resp. 47–48, 50–54; Tr. 51:1–13; Ex. 1007 ¶¶ 15, 20 ("All thread guide tubes associated with a single warping creel unit are fixed to the thread guide carrier 34 that is anchored in a fixed position in the floor of the machine hall."). Further, Barmag's use of 90-degree turns conflicts with Ligon's teaching that sharp turns should be avoided. *See supra* Section II.C.2.c.ii; -132 PO Resp. 41–45. Therefore, we

30

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

are not persuaded that a person of ordinary skill in the art would have been led to combine Barmag with Ligon, as Shaw contends.

### 4. Conclusion

Upon review of all of the evidence, we are not persuaded that a person of ordinary skill in the art would have been led to combine the teachings of Münnekehoff or Barmag with Ligon to achieve the claimed assemblies and methods, which require both same-side and across-frame thread transfers. Shaw has not shown, by a preponderance of the evidence, that claims 6, 7, 13, 15–18, and 21 would have been obvious over Münnekehoff and Ligon, or over Barmag and Ligon.

### D. Claim 4

Shaw argues in its Petition in Case IPR2013-00584 that claim 4 is unpatentable under 35 U.S.C. § 103(a) based on two combinations of references:  (1) Münnekehoff and Bluhm, and (2) Barmag and Bluhm. -584 Pet. 27–31, 39–42.  Shaw again relies on the testimony of Dr. Wang in support.  *Id*. (citing Ex. 1101 ¶¶ 38–44, 58–62).  We have reviewed Shaw's Petition, ACS's Patent Owner Response, and Shaw's Reply, as well as the evidence discussed in each of those papers.  We are persuaded, by a preponderance of the evidence, that claim 4 is unpatentable based on both asserted grounds.

31

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

*1. Ground Based on Münnekehoff and Bluhm*

*a. Bluhm*

Bluhm[8] discloses a "compact yarn supply creel adapted to support unusually large diameter yarn supply packages for continuous feeding of yarn to a textile yarn processing machine." Ex. 1111, col. 1, ll. 6–15. Yarn supply packages are supported on rotary frames of the creel in pairs, with each pair including "a feed package and a reserve package tailed together." *Id*. at col. 2, ll. 59–64. The paired packages face inward toward a "yarn guide," which "guid[es] the yarn as it is withdrawn from the yarn supply packages and direct[s] the yarn to the textile machine." *Id*. at col. 3, ll. 22–31.

---

[8] The assignee listed on the Bluhm reference is American Barmag Corporation. Ex. 1111. The applicant listed on the Münnekehoff and Barmag references is Barmag Barmer Maschinenfabrik AG. Exs. 1005, 1007.

32

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

Figure 3 of Bluhm is reproduced below.



Figure 3 depicts yarn support frame 20 with yarn supply packages P installed on yarn support spindles 51 that extend outwardly from yarn support posts 43 and 44. *Id*. at col. 6, ll. 3–18. As shown in Figure 3, yarn withdrawn from an active package enters yarn guide eye 63 of yarn feed tube 64 and travels vertically through yarn feed tube 64, horizontally through yarn feed tube 64, vertically through yarn feed tube 66, and horizontally through yarn feed tube 72 before finally reaching the textile machine. *Id*. at col. 6, l. 66–col. 7, l. 24. Yarn guide eye 63 is "positioned at

33

the apex of the longitudinal axes 60, 61 [shown in Figure 4] of the paired

yarn supply packages." *Id*. at col. 6, ll. 60–65.

*b. Analysis*

Shaw relies on Münnekehoff as teaching all of the limitations of

claims 1, 2, and 3, from which claim 4 depends. *See* -584 Pet. 17–20,

27–31. ACS does not dispute that Münnekehoff teaches all of the

limitations of claims 1, 2, and 3.

Claim 4 recites the additional limitation that "said annular turning

surface and said upper turning surface are separated by a distance

corresponding to the diameter of said packages." We interpret the phrase

"distance corresponding to the diameter of said packages" to mean a

distance that is derived from the diameter of a fully loaded package. *See*

*supra* Section II.A. Münnekehoff does not teach the distance limitation

because the distance separating balloon thread guides 14 (the "annular

turning surface") and the 90-degree turn in thread guiding tubes 21 shown at

the top of Figure 2 (the "upper turning surface") greatly exceeds, and is not

derived from, the diameter of a fully loaded package. This was the reason

*inter partes* review was denied as to claim 4 in Case IPR2013-00132. *See*

-132 Dec. on Inst. 23–25.

Shaw, therefore, relies on Bluhm as teaching the recited distance.

-584 Pet. 27–31. According to Shaw, Figure 3 of Bluhm depicts yarn guide

eye 63 as "generally aligned with the center axis of the package" and the

horizontal portion of yarn feed tube 64 as "slightly elevated above the outer

diameter of a fully loaded package." *Id*. at 28–29. In support of its

34

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

argument, Shaw provides on page 29 of its Petition an annotated version of

Figure 3 of Bluhm, reproduced below.



The annotated Figure 3 above includes a first arrow showing the distance

between yarn guide eye 63 and horizontal yarn feed tube 64, which is

approximately "half a diameter" (i.e., the radius) of a fully loaded package,

as indicated by the second arrow, according to Shaw.  *Id*.  Dr. Wang testifies

as to how the distance between turning surfaces in Bluhm is derived from

the diameter of a fully loaded package:

> The dependence of this distance between the annular and upper
> turning surfaces in Bluhm on the diameter of a fully loaded

35

> package is further driven by Bluhm's stated desire to minimize the overall size/height of the creel such that it is just large enough to receive the large diameter packages. To maintain the small size (and height) of the creel while utilizing the guiding means of Bluhm would require this distance to be minimized relative to the fully loaded package, and thus, to be derived from the diameter of a fully loaded package.

Ex. 1101 ¶ 39 (citations omitted).

Shaw also argues that Bluhm teaches the distance limitation of claim 4 because it discloses adjustability of the creel components. -584 Pet. 29–31. For instance, as shown in Figures 3 and 6 of Bluhm, yarn guide eye 63 is positioned at the "apex" of the axis of a corresponding package, and support plate means 30/31 (from which support arm 40 and yarn support spindle 51 extend) may be adjusted vertically. *See id*.; Ex. 1101 ¶ 40. Thus, according to Dr. Wang, "the space between each level can be adjusted and . . . the position of each yarn guide (63) can be adjusted to maintain the axial relationship with the package." Ex. 1101 ¶ 41. Dr. Wang testifies that the distance between yarn guide eye 63 and the point where yarn feed tube 64 turns from vertical to horizontal "necessarily corresponds to the diameter of a fully loaded package since this distance needs to vary depending on the particular size of the package installed and the resulting spacing between the vertically spaced levels." *Id*.

As to the reasons why a person of ordinary skill in the art would have combined the turning surfaces disclosed in Bluhm with the assembly of Münnekehoff, Dr. Wang testifies as follows:

> First, such alteration, substitution or combinations of guides with creels is commonly used in the industry to achieve manufacturer needs, as well as the product specifications and utilized materials. Applying common sense, a person of ordinary skill in the art would combine guide means of the type

36

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

disclosed in Bluhm with Munnekehoff's creel structure using well-known methods to obtain predictable desired results, such as enhanced adjustability or an altered overall creel footprint. Indeed, it is customary in the industry for vendors to offer an array of guide options marketed as individual components. In other words, such a combination is a substitution of one known, equivalent element (*i.e.*, tube guides) for another (*i.e.*, tube guides with telescoping sections).

Second, a person of ordinary skill would be able to readily combine guide means of Bluhm with the creel structure of Munnekehoff. For example, both the guide means of Bluhm and the guide (21) of Munnekehoff are tube-like structures. Accordingly, a person of ordinary skill could substitute the guide tube of Munnekehoff with the guide means of Bluhm to include guide tubes that are adjustably supported by support rods. This change would be motivated, for example, by the need to provide adjustability in the distance between bobbins and thread guides in Munnekehoff. (*See* Munnekehoff at claim 13)

*Id.* ¶¶ 43–44.

Shaw's analysis, supported by the testimony of Dr. Wang, is persuasive. Bluhm teaches an annular turning surface (i.e., yarn guide eye 63) generally aligned with the spindle supporting the corresponding package and an upper turning surface (i.e., the point where yarn feed tube 64 turns from vertical to horizontal) generally aligned with the outer diameter of a fully loaded package, such that the distance between the two is approximately the radius of a fully loaded package. Importantly, this is identical to the exemplary embodiment in the Specification of the '360 patent, which describes "distance h" as the radius of a fully loaded package:

Best results may be achieved where turning surfaces 73 and 74 are separated from one another by a *distance h corresponding to the diameter of the stranded material package 30*, such that the plane of the lower annular turning surface 73 is *generally*

37

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

> *aligned with, and preferably slightly elevated from the center axis of the package 30, or the support arm 144*.  The upper turning surface 74 is positioned so that it is *generally aligned with, and more preferably, slightly elevated above the outer diameter of a fully loaded package 30* so as to provide clearance between ballooning around package 30 and the running length of material as it is routed to the secondary guides 127.

*See* Ex. 1002, col. 9, ll. 27–38 (emphasis added); Fig. 19B.  The radius embodiment in Figure 19B of the '360 patent is the only embodiment the Specification references as having a distance "corresponding" to the diameter of the package.  The phrase "distance corresponding to the diameter of said packages," as used in claim 4, is very broad and encompasses, at minimum, the sole exemplary embodiment described in the Specification that has a distance of approximately the radius of a fully loaded package.  *See* -132 Dec. on Inst. 13–15.

Further, based on Bluhm's teaching of the adjustability of the creel components to ensure the correct spacing of packages within the creel, and Dr. Wang's analysis of the same, we are persuaded, by a preponderance of the evidence, that the distance between turning surfaces in Bluhm is derived from the diameter of a fully loaded package, and that a person of ordinary skill in the art would have had reason to incorporate Bluhm's distance between turning surfaces into Münnekehoff.

In its Patent Owner Response, ACS argues that Bluhm does not teach the distance limitation of claim 4 and that a person of ordinary skill in the art would not have combined Münnekehoff and Bluhm to achieve the creel magazine of claim 4.  We have reviewed all of the arguments made by ACS in its Patent Owner Response, and the evidence cited in support, but do not find them persuasive.

38

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

First, ACS argues that only the top row in Bluhm has a distance between yarn guide eye 63 and the horizontal portion of yarn feed tube 64 that is approximately the radius of a loaded package, and in the two lower rows, the horizontal portion is below the top of the loaded package. -584 PO Resp. 11–14. Thus, according to ACS and its declarant, Dr. Brookstein,[9] the distance between turning surfaces is "arbitrary" and not derived from the diameter of a fully loaded package. *Id.* (citing Ex. 2102 ¶¶ 38–40). Claim 4, however, does not require multiple levels, each with the same "distance corresponding to the diameter of said packages." Shaw relies on the single distance shown in the top row of Bluhm (i.e., approximately the radius of a fully loaded package), and proposes a modification to the assembly of Münnekehoff to use that distance. -584 Pet. 27–31. Whether other disclosures in Bluhm also teach the same distance is immaterial.

Second, ACS asserts that the distance between turning surfaces in Bluhm is not derived from the diameter of a fully loaded package because the upper turning surfaces are "between," not "over," the packages and "do not have a need to clear the height of the packages P." -584 PO Resp. 14–15 (citing Ex. 2012 ¶¶ 20, 40). We do not find this argument persuasive. Bluhm discloses that the package support spindles are "movable outwardly to a loading position where they extend outwardly from the rotary frame *to facilitate removing* the empty yarn supply package support and *replacing the*

---

[9] ACS states in its Patent Owner Response that certain portions of the Decision on Institution and Dr. Brookstein's testimony are "incorporated herein by reference." -584 PO Resp. 6–7, 44. Doing so was improper, and we consider Dr. Brookstein's testimony only to the extent ACS specifically refers to it in the Patent Owner Response. *See* 37 C.F.R. § 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document.").

*same* with a full yarn supply package." Ex. 1111, col. 3, ll. 17–22 (emphasis added).  Dr. Wang provides the following annotated version of a portion of Figure 4 of Bluhm to show how that motion would occur.



Ex. 1116 ¶ 14; *see also* Ex. 2301 at 147:10–149:5 (testimony of Dr. Wang regarding how the motion would occur).  As shown in the annotated figure above, in order for the assembly to swing out so that the packages can be replenished, the horizontal portion of yarn feed tube 64 would need to be above the height of the packages.  This is also shown in the top row of the assembly in Figure 3 of Bluhm.  We agree with Dr. Wang's reading of the reference.

Third, ACS disputes Dr. Wang's testimony regarding adjustability of the assembly in Bluhm, and argues that the height of the horizontal portion of yarn feed tube 64 is not adjustable.  -584 PO Resp. 15–18 (citing Ex. 2102 ¶¶ 58–60).  We first note that adjustability is not required by claim 4, but may be considered an indication that the relevant distance is in some sense derived from the diameter of a fully loaded package.  Thus, we determine whether Dr. Wang's opinions on adjustability are correct in light of ACS and Dr. Brookstein's argument to the contrary.

40

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

It is unclear from Bluhm whether yarn feed tube 64 is vertically adjustable. Bluhm discloses that "[t]he inner portions of the horizontal portions of the yarn feed tubes 64 are telescopically connected to the lower ends of vertical yarn feed tubes 66." Ex. 1111, col. 7, ll. 7–14. Thus, it is clear that yarn feed tube 64 is extendible horizontally via the telescopic connection. Reproduced below is an annotated version of a portion of Figure 3 of Bluhm.



The telescopic connection of yarn feed tube 64 is highlighted in the portion of Figure 3 above. Also highlighted is the vertical portion of yarn feed tube 64, which appears to show a similar telescopic connection for yarn guide eye 63. Figures 2 and 6 of Bluhm show a similar shape. Bluhm discloses that yarn guide eye 63 is "positioned" at the apex of the longitudinal axis of the package, and "supported" in the "lower end of the vertical leg" of yarn feed tube 64. *Id.* at col. 6, l. 60–col. 7, l. 2. Although Bluhm does not disclose expressly that the vertical portion of yarn feed tube 64 is telescopic with respect to yarn guide eye 63, the figures at least suggest that it is and, therefore, that the vertical portion of the tube (from where the yarn enters from the package to the top 90-degree turn) is extendible. Indeed, Figure 3

41

of Bluhm shows yarn guide eye 63 at different positions with respect to yarn feed tube 64 at each of the three levels, further suggesting that it may be extended up or down to align with the longitudinal axis of the respective package.

Nevertheless, even if yarn feed tube 64 is not vertically extendible, ACS does not dispute that Bluhm discloses vertically adjusting support plate means 30/31, from which yarn support spindles 51 extend, to provide for axial alignment between yarn guide eye 63 and the packages, and to provide for the appropriate spacing between levels. *See* Ex. 1111, col. 5, ll. 22–44; Ex. 1101 ¶¶ 40–41. That adjustability, combined with the fact that the distance shown in Figure 3 of Bluhm is approximately the radius of a fully loaded package (just like in the Specification of the '360 patent), is indicative of the relevant distance in Bluhm being derived from the diameter of a fully loaded package, as Shaw contends.

Fourth, ACS argues that Shaw does not explain sufficiently how the teachings of Münnekehoff and Bluhm would be combined, that the proposed combination would have resulted in an inoperable assembly, and that a person of ordinary skill in the art would not have been motivated to combine the references. -584 PO Resp. 24–39. We have reviewed ACS's arguments and do not find them persuasive. Shaw's contention, as supported by the testimony of Dr. Wang, is that the thread guiding tubes in Münnekehoff could be modified so that the relevant distance (i.e., the distance separating balloon thread guides 14 and the 90-degree turn in thread guiding tubes 21) is approximately the radius of a fully loaded package, as taught by Bluhm, and that a person of ordinary skill in the art would have had reason to do so. *See* -584 Pet. 27–31; Ex. 1101 ¶¶ 38–44 (describing how the modification

42

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

would be "using well-known methods to obtain predictable desired results, such as enhanced adjustability or an altered overall creel footprint," and that the "change would be motivated, for example, by the need to provide adjustability in the distance between bobbins and thread guides in Münnekehoff"); -584 Reply 10–13.  We see no reason why that would not be a simple change to the Münnekehoff assembly that would work to pull yarn from the various packages, or why Dr. Wang's alleged reasons, recounted above, as to why a person of ordinary skill in the art would have combined the references are incorrect.  Unlike its analysis of claims 6, 7, 13, 15–18, and 21, Shaw has provided sufficient articulated reasoning with rational underpinning to support the legal conclusion of obviousness as to claim 4.

Fifth, ACS argues that Bluhm "teaches against increasing the size of the footprint of a creel," which would be required by the proposed modifications to Münnekehoff.  -584 PO Resp. 39–44 (citing Ex. 2102 ¶ 50).  As support, ACS cites the disclosure in Bluhm that "the textile yarn processing machines are positioned in a manufacturing plant with a certain spacing therebetween and it is not possible to increase the size of the adjacent yarn supply creels because of the limited floor space."  Ex. 1111, col. 1, ll. 53–57; *see* -584 PO Resp. 40–41.  As Shaw points out, however, Münnekehoff likewise discloses a need to save floor space and describes one way to do so by pivoting the pegs to allow for the packages to be closer together.  -584 Reply 14; *see* Ex. 1005, p. 6, l. 34–p. 7, l. 10; p. 12, ll. 19–27.  Thus, the two references are consistent in that regard.

Shaw has shown, by a preponderance of the evidence, that claim 4 would have been obvious over Münnekehoff and Bluhm.

43

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

### 2. Ground Based on Barmag and Bluhm

The creel arrangement disclosed in Barmag is very similar to the one disclosed in Münnekehoff, and the parties' arguments and supporting testimony regarding Barmag in combination with Bluhm are nearly identical to the arguments and testimony regarding Münnekehoff and Bluhm.  *See* -584 Pet. 39–42; -584 PO Resp. 44–47; -584 Reply 14–15.  For similar reasons to those set forth above, we are persuaded that Shaw has shown, by a preponderance of the evidence, that the combination of Barmag and Bluhm is proper and that claim 4 would have been obvious based on the two references.  *See supra* Section II.D.1.b; -584 Pet. 39–42 (citing Ex. 1101 ¶¶ 58–62).

### 3. Conclusion

Based on the record evidence, in light of the arguments presented, Shaw has shown, by a preponderance of the evidence, that claim 4 would have been obvious over Münnekehoff and Bluhm, and over Barmag and Bluhm.

### E. Motions to Exclude

The party moving to exclude evidence bears the burden of proof to establish that it is entitled to the relief requested—namely, that the material sought to be excluded is inadmissible under the Federal Rules of Evidence.  *See* 37 C.F.R. §§ 42.20(c), 42.62(a).  For the reasons discussed below, all of the parties' motions to exclude are denied.

44

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

*1. Shaw's Motion to Exclude in Case IPR2013-00132*

Shaw moves to exclude two portions of Mr. Chadwick's declaration (Exhibit 2001), arguing that Mr. Chadwick is not qualified to offer expert testimony under Federal Rule of Evidence 702.  IPR2013-00132, Paper 30.  Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

First, Shaw argues that paragraph 21 of Mr. Chadwick's declaration, stating that Mr. Chadwick "personally know[s]" certain systems like those described in Münnekehoff and Barmag to cause injuries, should be excluded because Mr. Chadwick does not have "expertise in diagnosing medical injuries" and does not provide corroborating evidence for his testimony.  *Id.* at 3–4.  We do not rely on Mr. Chadwick's testimony in paragraph 21 regarding potential injuries as a basis for our decision regarding the combinations with Ligon and, therefore, deny Shaw's request to exclude paragraph 21 as moot.

Second, Shaw argues that paragraphs 43, 50, 60, 63, and 73 should be excluded because they pertain to patent law and Mr. Chadwick is not an expert in patent law.  *Id.* at 4–6.  Shaw points to instances where Mr. Chadwick used the term "hindsight" in his testimony, and also instances

45

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

where Mr. Chadwick allegedly failed to provide factual support for his opinions. *Id.* Shaw's arguments are not persuasive. In paragraphs 43, 50, 60, 63, and 73 of his declaration, Mr. Chadwick gives his opinions regarding the teachings of Münnekehoff, Barmag, and Ligon and whether a person of ordinary skill would have thought to combine them in the manner asserted by Shaw. The fact that Mr. Chadwick occasionally used the term "hindsight" does not mean that he was purporting to testify on matters of patent law or that his opinions are otherwise improper. Just as we are able to assess Dr. Wang's testimony and assign it the appropriate weight, we are able to do so for Mr. Chadwick's testimony.[10] Shaw's motion to exclude in Case IPR2013-00132 is denied.

### 2. ACS's Motion to Exclude in Case IPR2013-00132

ACS moves to exclude certain portions of Shaw's Reply and Dr. Wang's reply declaration (Exhibit 1013) as allegedly "mischaracteriz[ing]" certain testimony of Mr. Chadwick. IPR2013-00132, Paper 32 at 2–6. ACS contends that the materials should be excluded under Federal Rules of Evidence 104(b), 403, or 705, and cites one district court case where the court excluded certain evidence under Federal Rules of Evidence 402 and 403. *Id.* (citing *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 485 F. Supp. 2d 519, 535 (D. Del. 2007)).

---

[10] ACS, in its opposition to Shaw's motion to exclude, cites a revised declaration that it purports to have served as supplemental evidence in response to Shaw's original objection. IPR2013-00132, Paper 35 at 5, 6, 9. The revised declaration is not in the record, however, because ACS did not file a copy with its opposition. Thus, for purposes of deciding the motion to exclude, we refer only to Mr. Chadwick's declaration filed as Exhibit 2001.

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

ACS, however, does not explain in any detail why the materials are
*inadmissible* under those rules—as opposed to being merely incorrect in
ACS's view.  Although ACS certainly disagrees with Shaw's
characterization of the evidence, ACS does not explain sufficiently why or
how that is a proper basis to exclude the portions of Shaw's Reply and
Dr. Wang's reply declaration.  ACS's motion to exclude in Case
IPR2013-00132 is denied.

### 3. *Shaw's Motion to Exclude in Case IPR2013-00584*

Shaw moves to exclude two portions of Dr. Brookstein's declaration
(Exhibit 2102).  IPR2013-00584, Paper 29.  First, Shaw argues that
Dr. Brookstein's opinions in paragraphs 9, 12, 33, 36, and 63 should be
excluded under Federal Rule of Evidence 702 because they "lack proper
factual support."  *Id*. at 3–4.  Second, Shaw argues that paragraphs 11, 12,
17, 23, and 43 of Dr. Brookstein's declaration relate to features that are not
claimed or mentioned in the '360 patent, and should be excluded as
irrelevant under Federal Rule of Evidence 402.  *Id*. at 4–6.  We have
reviewed the cited paragraphs and see no basis on which they would warrant
the extreme remedy of exclusion.  Shaw's arguments indicate a mere
disagreement with Dr. Brookstein's testimony and pertain to the weight to
be given to that testimony, which we are able to assess without excluding it,
as explained above.  Shaw's motion to exclude in Case IPR2013-00584 is
denied.

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

*4. ACS's Motion to Exclude in Case IPR2013-00584*

ACS moves to exclude certain portions of Dr. Wang's original declaration (Exhibit 1101) and reply declaration (Exhibit 1116) as allegedly not based on sufficient facts or data under Federal Rule of Evidence 702. IPR2013-00584, Paper 32.  Again, a mere disagreement with the opposing party as to how evidence should be interpreted or weighed ordinarily does not mean that the evidence should be excluded.  We are able to assess the parties' arguments and assign the appropriate weight to all of the declarants' testimony, without excluding any particular portions.  ACS's motion to exclude in Case IPR2013-00584 is denied.

*F. Motion for Observation*

In Case IPR2013-00584, ACS filed a motion for observation (Paper 37) on the cross-examination of Dr. Wang, which took place after Shaw filed its Reply.  Shaw filed a response (Paper 40).  We have considered ACS's observations and Shaw's responses in rendering our decision.

*G. Exhibit 1015*

In Case IPR2013-00132, Shaw filed portions of the deposition transcript of Mr. Chadwick from the related district court action between the parties as Exhibit 1015.  The transcript as filed contains redacted material and is labeled "Confidential - Attorneys Eyes Only."  Neither party, however, filed a motion to seal with the exhibit.

A party intending for a document to be sealed must file a motion to seal with a proposed protective order.  *See* 37 C.F.R. §§ 42.14, 42.54(a).  Then, if such a motion were to be granted, the protective order would be

48

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

entered and would govern the treatment of confidential information in the proceeding. The parties shall confer and file either (1) an unredacted version of Exhibit 1015 to replace the existing version, (2) a confidential, unredacted version (as "Parties and Board Only" in the Patent Review Processing System) with a motion to seal, or (3) a request that Exhibit 1015 be expunged from the record of the proceeding. Any motion to seal must explain the basis for every redaction made and why the redacted material constitutes "confidential information." *See* 35 U.S.C. §§ 316(a)(1), 316(a)(7); 37 C.F.R. §§ 42.14, 42.54(a); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,770 (Aug. 14, 2012) (describing the procedure for filing redacted and unredacted copies of a document). If the parties are unable to reach an agreement on how Exhibit 1015 should be treated, the parties shall file a joint statement setting forth their respective positions.

## III. ORDER

Shaw has demonstrated, by a preponderance of the evidence, that:

(1)    claims 1–3, 5, 8–10, 12, 14, 19, and 20 are anticipated by Münnekehoff under 35 U.S.C. § 102(b);

(2)    claims 1–3, 5, 8–10, 12, 14, 19, and 20 are anticipated by Barmag under 35 U.S.C. § 102(b);

(3)    claim 4 is unpatentable over Münnekehoff and Bluhm under 35 U.S.C. § 103(a);

(4)    claim 4 is unpatentable over Barmag and Bluhm under 35 U.S.C. § 103(a);

(5)    claim 11 is unpatentable over Münnekehoff and Miller under 35 U.S.C. § 103(a); and

(6)    claim 11 is unpatentable over Barmag and Miller under 35 U.S.C. § 103(a).

49

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

Shaw has not demonstrated, by a preponderance of the evidence, that claims 6, 7, 13, 15–18, and 21 are unpatentable over Münnekehoff and Ligon, or that claims 6, 7, 13, 15–18, and 21 are unpatentable over Barmag and Ligon.

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–5, 8–12, 14, 19, and 20 of the '360 patent have been shown to be unpatentable;

FURTHER ORDERED that claims 6, 7, 13, 15–18, and 21 of the '360 patent have not been shown to be unpatentable;

FURTHER ORDERED that the parties' motions to exclude in the instant proceedings are *denied*; and

FURTHER ORDERED that the parties shall file in Case IPR2013-00132, within one week of this decision, an unredacted version of Exhibit 1015 to replace the existing version; a confidential, unredacted version with a motion to seal; a request that the exhibit be expunged; or a joint statement, limited to five pages, setting forth the parties' respective positions.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00132 and IPR2013-00584
Patent 7,806,360 B2

PETITIONER:

W. Karl Renner
Hyun Jin In
Thomas Rozylowicz
FISH & RICHARDSON P.C.
axf@fr.com
apsi@fr.com
rozylowicz@fr.com


PATENT OWNER:

Scott Smiley
Mark C. Johnson
THE CONCEPT LAW GROUP
Info@ConceptLaw.com
mjohnson@conceptlaw.com

51

US007806360B2

(12) **United States Patent**
Chadwick

(10) Patent No.: **US 7,806,360 B2**
(45) Date of Patent: **\*Oct. 5, 2010**

(54) **CREEL MAGAZINE SUPPLY SYSTEM AND METHOD**

(75) Inventor: **David Chadwick**, Alpharetta, GA (US)

(73) Assignee: **Automated Creel Systems, Inc.**, Alpharetta, GA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/253,398**

(22) Filed: **Oct. 17, 2008**

(65) **Prior Publication Data**

US 2009/0101749 A1    Apr. 23, 2009

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/875,254, filed on Oct. 19, 2007.

(51) **Int. Cl.**
*B65H 67/00* (2006.01)
*B65H 49/00* (2006.01)
*D02H 1/00* (2006.01)

(52) **U.S. Cl.** ........................ **242/560**; 242/131; 28/193; 66/125 R

(58) **Field of Classification Search** ................ 242/551, 242/557, 558, 559, 559.3, 560, 588, 590, 242/593, 594, 594.6, 597, 597.8, 131, 131.1; 139/246–252; 414/222.01, 267, 331; 66/125 R, 66/125 A, 168; 28/190, 193
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 3,321,153 | A | * | 5/1967 | Bryan, Jr. | .................... 242/131 |
| 3,377,677 | A | * | 4/1968 | Furst | ........................... 28/193 |
| 4,498,644 | A | * | 2/1985 | Kupper et al. | ........... 242/131.1 |
| 4,852,824 | A | * | 8/1989 | Beitz et al. | ............... 242/131.1 |
| 5,451,006 | A | * | 9/1995 | Smith | ...................... 242/131.1 |
| 5,927,629 | A | * | 7/1999 | Dixon | ................... 242/150 R |

\* cited by examiner

*Primary Examiner*—John Q Nguyen
*Assistant Examiner*—William E Dondero
(74) *Attorney, Agent, or Firm*—Smith, Gambrell & Russell

(57) **ABSTRACT**

A creel magazine for continuously delivering packaged stranded material to a manufacturing process. A plurality of magazines linearly disposed in substantially parallel alignment are alternately supplied stranded materials fed to the manufacturing process from movable magazine cartridges supporting packages of stranded materials form either side of the magazine frame. The apparatus and method provide for sequential delivery of stranded materials from packages supported by cartridges at the sides of the magazines, intermediate replenishment of the depleted cartridges with cartridges loaded with replenished packages.

**21 Claims, 18 Drawing Sheets**







FIG. 2



FIG. 3

U.S. Patent

Oct. 5, 2010

Sheet 4 of 18

US 7,806,360 B2

A0056



FIG. 4A

FIG. 4B

U.S. Patent

Oct. 5, 2010

Sheet 5 of 18

US 7,806,360 B2

A0057



FIG. 5







FIG. 9





**FIG. 11**



**FIG. 10C**

U.S. Patent    Oct. 5, 2010    Sheet 11 of 18    US 7,806,360 B2

A0063



*Fig _ 12*

U.S. Patent

Oct. 5, 2010

Sheet 12 of 18

US 7,806,360 B2



A0064

U.S. Patent

Oct. 5, 2010

Sheet 13 of 18

US 7,806,360 B2

A0065



Fig. 14

U.S. Patent     Oct. 5, 2010     Sheet 14 of 18     US 7,806,360 B2

A0066



# Fig. 15

A0067

U.S. Patent

Oct. 5, 2010

Sheet 15 of 18

US 7,806,360 B2



Fig. 16A

U.S. Patent

Oct. 5, 2010

Sheet 16 of 18

US 7,806,360 B2

A0068



Fig. 16B





US 7,806,360 B2

**1**

## CREEL MAGAZINE SUPPLY SYSTEM AND METHOD

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation in part of U.S. patent application Ser. No. 11/875,254, filed Oct. 19, 2007.

### BACKGROUND OF THE INVENTION

1. Technical Field

The present invention generally relates to creels used for supplying stranded materials to a machine or process for subsequent treatment of the stranded materials or for the fabrication of articles out of the stranded materials. More particularly, the present invention relates to an apparatus and method for supporting a plurality of spools of stranded material, or packages, such that the stranded material carried by the packages may be sequentially supplied to a machine or industrial process. With even greater particularity, the invention relates to a creel magazine capable of receiving and guiding a predetermined number of strands of material to a machine or industrial process, wherein a creel cartridge carries a plurality of material packages sequentially connected for each of the predetermined strands.

2. Related Art

The use of creels for supporting stranded material packages is well known in the textile industry and finds application in other industries utilizing stranded materials as well. Modern high-speed processing systems require a continuous, uninterrupted supply of yarns, fed from a plurality of yarn packages supported throughout the creel. However, despite their widespread use, the task of loading and maintaining the supply of stranded materials in the creel remains an extremely labor intensive operation, involving both gross and fine motor skills. Moreover, the efficiency of these systems is dependent upon the ability to provide a continuous stream of material to the process. Interruptions of the process are usually caused by a breakage of the stranded material which occur most frequently where successive material packages are joined, such as by a knot or other methods well known in the art.

Depending on the location of the breakage, process down time can be a matter of minutes, reflecting system shutdown, fault diagnosis, rejoining the broken strands, and system restart procedures. Moreover, modern high speed processing systems are usually designed with fault detection measures that are intended to prevent broken strands from entering the processing machinery. However, should these systems fail and a strand breakage enters the system, or where a strand breaks internally of the system, delays on the order of hours may be experienced as the entire machine will need to be reset.

Conventional creel systems utilize yarn package supports which are arrayed on a plurality of support posts extending from a free standing frame of the creel and positioned so as to feed the manufacturing process. Eyelets or other guide means are provided vertically and laterally throughout the creel through which each of a plurality of yarn strands are fed to the processing system. Accordingly, monitoring, loading and maintenance of the creel is performed from a front side of the creel so that the operators will not be exposed to hazards presented by running lengths of stranded materials extending from the back side of the creel. In the typical process, a pair of package supports are configured in alignment with each eye-

**2**

let and the respective yarn strands from the paired packages are tied or otherwise attached in series to alternately feed the process.

Replacement of a yarn package in a creel typically requires a worker to remove a depleted package cone out of the creel from its working position to a loading position; remove and dispose of a spent cone from the package holder; lift the replacement yarn package from a delivery platform, such as a pallet or bulk container cart; transport the package to the indicated package support; manipulate the package to mount it on the package support; rotate the replenished package support into the creel; and tie or otherwise secure the lead end of the replenished yarn package to the tail end of the paired feeding yarn package. As can be readily seen, the operation and maintenance of a typical creel is and remains a labor intensive task

In systems utilizing manual loading methods, a typical package will be limited to having a weight on the order of 8 to 14 pounds. In a given shift, a textile worker tasked with loading and maintaining the creel in a conventional process will lift, transport, and manipulate as much as six thousand pounds of packaged materials. Because the package supports are arrayed at varying heights and distances from the delivery platform, the typical laborer is subjected to significant risk of musculo-skeletal injuries presented at each step of the yarn package replacement process. Moreover, because the loading and replenishment of individual packages occurs at the creel, the activity remains a complex labor intensive one when combined with the related tasks of monitoring the condition, maintenance and performance of the system. Accordingly, there remains a need for improving the efficiency and reducing the complexity of creel operations.

### BRIEF SUMMARY OF THE INVENTION

An object of the present invention is to improve the efficiency of creel systems utilized in manufacturing processes utilizing packages of stranded materials. This object is realized by providing the packages with a pre configured supply of materials ready for direct loading into the creel. The pre-configured supply of materials, carried on movable carts, or cartridges, are preferably loaded by automated means at a separate work station. More preferably, the packages are loaded directly onto the cartridge following completion of a preceding process, typically loading of the packages with the stranded material. Another object of the invention is to provide means for reducing the complexity of operator tasks performed at the creel, thereby relieving the risk of musculoskeletal stresses on the laborers tasked to operate a creel and improving efficiency and performance of the operator manning that station.

The invention also alleviates risks to operators associated with high speed running strands of material as they are supplied to the process, such as the risk of severing appendages. This hazard is reduced significantly by elevating the running strands overhead of the operator's work station.

### BRIEF DESCRIPTION OF THE SEVERAL DRAWINGS

FIG. **1** depicts an overhead plan view of a stranded material magazine supply system for a manufacturing process.

FIG. **2** depicts an alternative overhead plan view of a stranded material magazine supply system for a manufacturing process.

FIG. **3** depicts a side elevational view of a stranded material magazine supply system for a manufacturing process.

3

FIG. **4**A depicts an overhead plan view of a magazine.

FIG. **4**B depicts a detailed view of material routing in the magazine shown in **4**A.

FIG. **5** depicts an end elevational view of a magazine.

FIG. **6** depicts a side elevational view of a magazine.

FIG. **7** depicts an end view of a cartridge.

FIG. **8** depicts a side elevational view of a cartridge.

FIG. **9** depicts a detailed end elevational view of the threading of successive packages.

FIG. **10**A depicts a side elevational view of a cartridge post and package rotator.

FIG. **10**B depicts an overhead plan view of a cartridge post and package rotator.

FIG. **10**C depicts a perspective view of a guide channel, defined in a cartridge post.

FIG. **11** depicts a side elevational view of a transfer device.

FIG. **12** depicts a perspective view of a creel magazine configured with a ring guide.

FIG. **13** depicts a plan view of a creel magazine configured with a ring guide.

FIG. **14** depicts a side elevational view of a creel magazine configured with a ring guide.

FIG. **15** depicts a detailed view illustrating the routing of the stranded material in the magazine shown in FIGS. **12-14**.

FIG. **16**A depicts a plan view of a creel magazine system according to a preferred alternative embodiment of the invention with stranded materials supplied by odd numbered carts.

FIG. **16**B depicts a plan view of a creel magazine system according to a preferred alternative embodiment of the invention with stranded materials supplied by even numbered carts.

FIG. **17** depicts an embodiment of a guide board.

FIG. **18** depicts an embodiment of a secondary guide.

FIG. **19**A depicts a perspective view of a ring guide according to a preferred embodiment of the invention.

FIG. **19**B depicts a side elevational view of a ring guide according to a preferred embodiment of the invention.

DETAILED DESCRIPTION OF THE INVENTION

The creel magazine supply system and method of the present invention may be constructed as a complete system or is adaptable to an existing manufacturing facility working with stranded materials. In reference to FIGS. **1-4**, the system comprises a creel **10**, a plurality of creel magazine **20** each servicing a plurality of spools of stranded material, or packages **30**. After leaving the creel magazines **20**, the running ends of the stranded material S are routed to the manufacturing process via creel **10** comprising a plurality of guides **11**, guide boards **12**, or return rollers **13**, supported in the facility according to conventional methods. As will be appreciated by those of skill in the art the length of the creel run L, is generally determined by the machine or process treating the stranded material, particularly with respect to parameters for detecting and preventing material breaks from entering the machine proper, such as the machine operating speed, break detection time, and machine interrupt or shut down times.

The creel magazine supply system and method is designed around magazine **20** comprising a stationary magazine frame **21** and a pair of movable, replenishable carts, or cartridges **40**. Each cartridge **40** is configured to carry a plurality of packages **30**. As may be seen in reference to FIGS. **5** and **6**, each cartridge **40** is configured to carry packages **30** in an array of two vertical columns and three rows at a depth of two packages **30** each, for a total of twelve packages **30** per cartridge **40**, and total of twenty four packages **30** in a magazine **20**

4

utilizing two cartridges **40**. In the embodiment described, cartridge **40** allows for six running ends of material S to be fed to creel **10** at a time.

As may be appreciated, magazines **20** can be arranged to supply creel **10** with any number of running ends of material S. Utilizing the maximum capacity of each magazine **20** configured as described above, incremental strand counts of 48, 42, 36, 30, 24 may be readily achieved according to the needs of the manufacturing process by the addition or subtraction of magazines **20** to the site layout. Magazines **20** may be arranged any number of ways determined by the physical dimensions and process requirements of the manufacturing facility. In a preferred configuration, such as that depicted in FIG. **1**, magazines **20** will be angled with respect to the creel run L towards return roller **13** to help reduce friction on the material S and drag on the material as it pulls the material into the process. An angled design also allows for better access to the magazine **20** and cartridges **40** or carts for tying and routing strands and other maintenance tasks. Maintenance in this area is typically referred to as a "break out" and must be attended to by the machine operator.

In reference to FIGS. **7-8**, replaceable cartridge or cart **40**, is comprised of a platform **41** supported by ground wheels **42** and a post or vertical frame **43** mounted to and extending from platform **41**. In the embodiment depicted, support arms **44** are provided in opposed pairs, pivotally mounted to vertical frame **43** via a package rotator **50**. As shown in FIGS. **10**A and **10**B, package rotator **50** is comprised of support arms **44** attached to and extending laterally outwardly from a collar **51**. Collar **51** rotates about a rotator bearing surface **52**, which is provided with a guide channel **53**. Guide channel **53** receives a guide pin **54** extending from an inner surface of collar **51**, to guide and constrain the extent of rotation of support arms **44**. Guide channel **53** should also have a detent **55** to ensure positive alignment of support arm **44** and to alert the operator when support arm **44** is rotated to the correct position.

As may be seen, package rotators **50** are attached to vertical frame **43** to define an array having a predetermined number of columns, rows and banks based upon facility requirements or other operational considerations. In this embodiment support arms **44** are arranged in a 2×3×2 array, that is two columns, three rows, and two banks, on vertical frame **43** for a total of twelve packages **30** per cartridge **40**. A horizontal frame member **45** may be provided between adjacent vertical frame members **43** for added support. In the configuration depicted in FIGS. **7-8**, package rotator **50** permits rotation of support arms **44** through an arc of 180 degrees about a vertical axis corresponding to the respective vertical frame member **43**.

Package rotator **50** may be configured according to the arrangement described in U.S. Provisional Patent Application No. 60/885,743, incorporated herein by reference, with guide channel **53** defined in a substantially horizontal plane. Alternatively, instead of providing a discrete rotator bearing, rotator bearing surface **52** may be provided by an outer surface of the vertical frame member **43** wherein guide channel **53** may be formed in the vertical frame members **43**. Package rotators **50** are positioned at an appropriate elevation on vertical frame **43** based on the diameter of the package **30**, the number of rows of packages on the cartridge **40**, and the stranded material being utilized in the manufacturing process. A modified set collar **56** may be mounted below each rotator bearing surface **52** to support collar **51** at the bearing surface **52**. Collar **51** may then be positioned on vertical frame **43** during assembly. In the embodiment depicted, collar **51** has threaded apertures **57** spaced 180 degrees apart. The support arms **44** may then be inserted into the treaded apertures **57** to protrude

US 7,806,360 B2

5

into the guide channel **53**, thus allowing 180 degree movement around the vertical frame **43** and supporting the weight of the package **30**. As best seen in reference to FIGS. **4**A and **4**B, cartridge **40** further comprises a guide system for routing stranded material S to magazine **20** when cartridge **40** has been inserted into magazine **20**. As depicted at least one transfer device **60**, described herein below, is attached at the ends of cartridge **40**, to keep the interconnected strands of material from becoming entangled while the stranded materials are being supplied to the manufacturing process. Referring to FIGS. **4**, **5** and **6**, stationary magazine frame **21** is secured to the floor of the manufacturing facility and is fed material supplied from cartridges **40** positioned adjacent magazine frame **21** Stationary magazine frame **21** comprises a plurality of horizontal members **22** interconnecting upright members **23** positioned at opposite ends of the magazine frame **21**. Upright members **23** are spaced apart by a distance corresponding to the width of cartridge **40**. Horizontal members **22** are positioned between upright members **23** at a height slightly above an associated support arm **44** carried by cartridge **40** and below a superjacent support arm **44** so that the horizontal members **22** are positioned at elevations between the rows of package **30**. Transverse members **29** extend between upright members **23** or horizontal members **22** to provide lateral stability to the magazine frame **21**.

Magazine frame **21**, includes a magazine guide system that will accommodate each running end of material S supplied by a cartridge **30** and route it to the creel **10**. As best seen in reference to FIG. **5**, the guide system includes guide rods **24** extending laterally and inwardly from upright members **23** towards the interior of magazine **20**, so that the running length of stranded material may be turned as it is drawn over a surface of the guide rod **24** and carried towards a primary guide **26**, supported on a horizontal member **22** and positioned near a longitudinal centerline of the magazine frame **21**. Guide rods **24** are positioned slightly above a longitudinal axis of its associated package **30**, and laterally outwardly from a longitudinal centerline of magazine frame **21**.

Primary guides **26** are provided in horizontal members **22** in spaced relation to each other to direct each strand of material from guide rod **24** and route it vertically to the top of magazine **20**. Primary guides **26** are preferably ceramic, but may be made of any suitable material. Secondary guides **27**, which may include a guide board or roller, are mounted on an upright member **23** proximal creel **10**, and receive material from an uppermost set of primary guides **26**. Material leaving secondary guides **27** is then directed towards and carried by guides **11**, guide boards **12**, and/or return roller **13** of creel **10**, depending upon the magazine's placement in relation to creel **10**.

As will be recognized by those skilled in the art, particularly with respect to stranded materials such as yarns utilized in textiles, as the yarn is pulled from the package **30**, it will unwind from package **30** and form a balloon around and at the end of the package **30**. Guide rod **24** is positioned to reduce the diameter of the balloon coming off the package **30**. Preferably, guide rod **24** will be vertically adjustable to maintain a limiting effect on balloon formation as package **30** is depleted. Guide rods **24** may include a roller sleeve **25** to reduce friction between the rod **24** and material S as it is drawn over the turning surface.

To reduce the potential for the balloons from adjacent rows of packages from becoming entangled, magazine frame **21** may also be provided with a shield **28** supported by transverse members **29** and horizontal members **22**. Shield **28** is a substantially rectangular plate, as seen in reference to FIG. **5**, and extends outwardly beyond the upright frame members **23** and

6

transverse frame members **29** so that the side edges of the shield **28** are positioned between adjacent rows of packages **30** supported on cartridge **40**. As seen in reference to FIG. **6** the ends of the shield **28** may extend to and be supported by upright members **23**. Preferably, shield **28** is comprised of a transparent material, such as glass or plexiglass, so that the operator may visually inspect the condition of the yarn feeds within magazine **20** and the condition of the supplying packages **30** on cartridges **40**. A transparent shield **28** will also facilitate the operator's ability to join and route successive running ends of stranded material.

Magazine frame **21** and cartridges **40** should be configured such that cartridges **40** are positioned adjacent to the frame **21** in proper alignment with primary guides **26** and are secured to prevent unwanted movement during use. Any suitable means for securing carts **40** are acceptable, for example, carts **40** may be indexed with respect to magazine frame **21** such that each adjacent cart secures each other adjacent cart, or a floor track **47** or even cartridge guides **46**, whether incorporated with frame **21** or ancillary to them may also be suitable.

The configuration of the creel magazine supply system thus described permits improved efficiency in the delivery of stranded material to a manufacturing process. First, the transportability of cartridges **40** permits loading of packages **30** onto cart **40** by automated methods such as that disclosed in U.S. Provisional Patent Application No. 60/885,743, so that loading of packages **30** onto support arms **44** is performed remotely from the magazine **20**, thereby reducing the complexity of tasks performed at the magazines **20**. Similarly, because cartridge **40** may be loaded via automated means, the size, and thereby the length of stranded material carried by a package **30** may be dramatically increased, from the 8-14 pounds in conventional manual systems, to at least forty pounds permitted by automated loading systems. Because the strand length is increased, a significant source of breakages, i.e. knots or joints, are substantially reduced, thereby contributing to the efficiency and reliability of the process.

Next, the magazine configured creel eliminates a primary and substantial source of musculo-skeletal injury exposure presented by loading packages **30** at the creel. By providing a mobile, fully loaded cartridge **40**, the magazine **20** can be replenished without lifting as is necessary in conventional methods. As will be more fully described below, the creel magazine **20** of the present invention permits the system to be pre-loaded with four packages **30** of material to supply a selected primary guide **26**, prior to initiating a run. The unique configuration of the magazine frame **21** and its associated cartridges **40** permits each of four packages **30** to be fed in sequence to the manufacturing process, alternating between packages **30** carried on a first cartridge **40** and second cartridge **40'**. As annotated in FIG. **5**, packages **30**a-**30**d, are fed sequentially to magazine frame **21**, in a modified tip to tail, back and forth fashion, whereas current systems feed tip to tail in a stage by side configuration.

To run packages **30** in the modified tip to tail fashion, the leading end of material from package **30**a is routed under guide rod **24** and then upwardly through primary guides **26** to the top of magazine frame **21**. From there, the leading end is carried horizontally to secondary guide, or guide board **27** and then routed through guides **11**, guide boards **12**, or return roller **13** of the creel **10** depending upon a magazine's **20** placement in the process configuration. Each of the six corresponding packages **30**a, that is, one each for the two column and three rows of packages **30** carried by the cart **40** are routed in similar manner. By advantageously guiding the materials to the top of the magazine frame **21** the strands can be routed

US 7,806,360 B2

7

such that the operators may have ready access to the magazine frame 21 and its associated cartridges 40.

The transfer of stranded material across the magazine frame 21 is more clearly illustrated in reference to FIG. 9, the trailing end of package $30_n$ is tied or joined with the leading end of package $30_{n+1}$, which is mounted on cartridge 40' positioned transversely across magazine frame 21 from cartridge 40. As previously described, as the yarn spools off its package 30 it creates a balloon around the package 30. Therefore, when joining the tip of a subsequent package $30_{n+1}$ to the tail of its preceding package $30_n$, the joined material, primarily the leading end of $30_{n+1}$, must be routed across magazine frame 21 yet retained out of the way to prevent the "balloon" on the running package $30_n$ from tangling therewith. The running of material from the subsequent package must be allowed pull freely once transfer to the subsequent package commences.

To achieve this, a transfer device 60, such as that depicted in FIG. 11 pivotally mounted to the magazine frame 21 at a position outside the region in which moving strands tend to balloon, as may be seen in reference to FIGS. 6 and 9. Transfer device 60 comprises an elongated member or bar 61, having a U-shaped recess 62 formed at a first end of bar 61 and a counterweight 63 formed at a second end of bar 61. Bar 61 is pivotally mounted to a post 64 via a pivot 65. Counterweight 63 is selected such that recess 62 is oriented vertically in a retaining position. A slight lateral forces will permit bar 61 to pivot to a release position. Suitable results for transferring stranded materials across the magazine frame 21 can be achieved without the transfer device 60, such as by simply placing the strands atop the shield 28 and along the edge thereof so that the connecting stranded material is out of the way and will not become entangled with the running lengths or balloons of stranded material. Alternatively, a small patch of hooked fastener material, such as Velcro may be used to temporarily hold the stranded material so that it will release from the material during transfer of the running length across the magazine 20. The use of a transfer device 60 is preferred since it can provide the operator a positive visual indication that the stranded materials have been properly routed to effectuate transfer of the stranded materials across the magazine 20. In the embodiment shown in FIGS. 12 and 16, the transfer device is mounted at the corners of the magazine 20, at positions located outwardly from the packages 30.

Again, in reference to FIG. 9, the routing of the running ends is depicted in detail illustrating the initial routing of package $30_n$, the modified tip to tail side by side interconnection of packages $30_n$ and $30_{n+1}$, and the transfer of material supply between packages $30_n$ and $30_{n+1}$. The initial routing of the running end of package $30_n$ is shown by the arrowed line a, at the top of the left hand package $30_n$. The running end is routed under guide rod 24 and upwardly to primary guide 26. At the lower left hand side, the leading end of yarn $30_{n+1}$ is depicted by dashed arrowed line b, and is shown routed through transfer device 60 and tied to the tail end of package $30_n$. As the material from package $30_n$ is depleted, the joined ends of material $30_n$ and $30_{n+1}$ are drawn towards guide rod 24 and primary guide 26 as depicted by the joined lines at c, at the lower end and slightly to the right of package $30_n$. As the joined ends are drawn upwardly towards primary guide 26, running end $30_{n+1}$ begins to exert pressure on the side of notch 62 so that transfer device 60 tips laterally to release running end $30_{n+1}$ from notch 62, shown by dashed line d, effectuating transfer of supply from package $30_n$ to package $30_{n+1}$. Depending upon the diameter of packages 30, an additional transfer device 60 may be required to be positioned on each cart 40 and at the outer ends thereof, so that effective retention

8

and subsequent transfer may be effectuated. Upon complete transfer, running end $30_{n+1}$ is pulled into the creel along the routing described above for package $30_n$. After transfer to package $30_{n+1}$ is complete the depleted package $30_n$ is rotated about axis A as depicted in FIG. 5 and fresh package 30 is positioned relative to magazine frame 21. In repeating the sequence, the previously defined package $30_{n+1}$ becomes $30_n$, and the rotated replenished package 30 becomes the next $S_{n+1}$. According to this method, a fully loaded creel magazine 20 can provide an initial run twice that of conventional creels before the magazine 20 will require replenishment, thereby leading to greater efficiency in the process. As will be readily appreciated, once a cartridge 40 is depleted, it may be removed from the magazine 20 and replaced with a replenished cartridge 40, and the process continued.

Thus, one of the many objectives of the present invention is to allow the cartridges 40 to be loaded at a remote location so as to eliminate loading tasks at the magazine 20. Additional efficiency may be realized where a stranded material undergoes a prior process to be produced as a package 30 at the conclusion of that process. Customarily, packages 30 produced in a previous process are simply loaded and stacked in a bulk carrying cart and then wheeled to the next process station at which the packages 30 are then manually removed from the bulk carrying cart and loaded into the next process. By the method contemplated by the present invention, the packages 30 may be directly loaded onto a cartridge 40 upon completion of the previous process, thereby saving labor costs and increasing efficiency by eliminating double handling the packages 30.

The unique capability of the invention to sequentially transfer the delivery of stranded material S from packages 30 located on one side of the creel magazine 120 to a package 30 on another side of the creel magazine 120 lends itself to further efficiencies in the manufacturing process. In accordance with the principles discussed above, an alternative preferred embodiment of a creel magazine according to the invention is illustrated in FIGS. 12-16, in which alternating cartridges 140 supply stranded materials to the creel magazine frame 121. Rather than replenishing individual support arms 144 as their associated packages 30 are depleted, this embodiment of the invention contemplates replacement or replenishment of packages on alternating sets of cartridges 140, such that the creel can be continuously supplied with stranded material. Packages 30 are preferably loaded onto the cart 140 at the output of a prior processing step, thereby substantially reducing the handling of the packages 30. The transfer capability of the invention thus permits continuous, non-stop running of the manufacturing process by successively replacing alternating odd and even numbered carts 140 as their respective packages 30 become depleted.

Because there is no need to rotate depleted packages 30 on cart 140 in this embodiment of the invention, the construction of carts 140 for this embodiment can be greatly simplified. It will be appreciated from FIGS. 13-15 that the alignment and separation of adjacent support arms 144 will be governed by the size of the packages 30 utilized by the process. Where a fixed size package 30 will be utilized in the process, the support arms 144 are preferably attached to the cartridge 140 in a fixed orientation relative to the magazine frame 121, such as by welding, or they may be adjustably attached, such as by a bolt. As more clearly seen in reference to FIGS. 13 and 15, the support arms 144 are preferably attached to the cartridge 140 such that their longitudinal axis is directed substantially toward the primary guide 126, or a ring guide 70, described below.

A0074

US 7,806,360 B2

9

Proper alignment of the support arms **144** with the primary guide **26**, or ring guides **70**, can be facilitated by indexing the cartridge **140** positioning with respect to the creel magazine **120**. To this end, as seen in reference to FIGS. **12** and **15**, the cartridge **140** may be retained in position relative the magazine **120**, such as via a downwardly extending pin **146** that is engaged in a track **147**, thereby maintaining the proper lateral separation between the cart **140** and the magazine frame **121**. Track **147** will have an opening at its first end for receiving the pin **146**. Preferably a stop **148** is provided at an opposite end of the track **147**, to provide a positive indication of the proper longitudinal positioning of the cart **140** relative to the magazine **120**.

As further seen in reference to FIG. **12**, the guide rods **24** and sleeve **25** of the previous embodiments may be replaced by a ring guide **70** mounted by any suitable means at a central position in the magazine frame **121**. In this embodiment the stationary magazine frame **121** includes a transverse frame member **129** connected between the horizontal members **122**, preferably at a mid point of the magazine frame **121**. As detailed in FIGS. **19**A and **19**B, the ring guide **70** has an attachment plate **71** for attachment to transverse member **129** via bolts **72**, clamps, welds or any suitable means. The ring guide **70** further comprises a lower ring having an annular turning surface **73** and an upper ring, mounted substantially parallel to the lower ring, defining an upper turning surface **74** which are substantially parallel to one another. Preferably the upper rings are coaxially aligned. Best results may be achieved where turning surfaces **73** and **74** are separated from one another by a distance h corresponding to the diameter of the stranded material package **30**, such that the plane of the lower annular turning surface **73** is generally aligned with, and preferably slightly elevated from the center axis of the package **30**, or the support arm **144**. The upper turning surface **74** is positioned so that it is generally aligned with, and more preferably, slightly elevated above the outer diameter of a fully loaded package **30** so as to provide clearance between ballooning around package **30** and the running length of material as it is routed to the secondary guides **127**. In the embodiment shown, the annular turning surface **73** is attached to an elongate rod **75**, or bar extending downwardly from the attachment plate **71**, while the upper turning surface **74** may be supported on a plate **76** connected to either the attachment plate **71** or the elongate rod **75**. The upper turning surface **74** is preferably a standard ceramic guide **78**, of a type well known in the art, that is received in a bore **77** defined in plate **76**, and retained by a resilient ring **79**, snap-ring, adhesives or the like. The lower annular turning surface **73** preferably has a surface that is substantially larger than that of the upper turning surface, and generally on the order of between about 3 to 8 inches. Annular turning surface **73** functions in essentially the same manner as the guide rods **24** in controlling ballooning of the stranded material S as it is drawn from packages **30**, and turns the running length of stranded material from a generally horizontal travel to a vertical travel as it is drawn upwards towards upper turning surface **74**. The ring shape of the annular turning surface **73** permits the ring guide **70** to receive and control ballooning in the stranded material from any direction, regardless of which package **30** is feeding the magazine and is especially beneficial to control ballooning when the strands transfer across the magazine frame **121** from one cart to the other. When the running length of stranded material passes through the upper turning surface **74**, it turns the stranded material to a generally horizontal travel so that the stranded material may be carried outwardly to the lateral aspects of the magazine **120**.

Routing of the stranded material is substantially similar to that in the earlier described embodiments. As best seen in reference to FIGS. **13** and **15**, the stranded material is routed from package **30**a horizontally to the ring guide **70** as shown

10

by segment a. The stranded material is then routed through the lower annular turning surface **73**, through the upper turning surface **74**, and then laterally to a secondary guide **127**, as shown by segment b. Secondary guide **127** may be positioned at any point along the lateral aspect of the magazine frame **21**, such as at a corner as depicted in FIG. **14**, or near a midpoint thereof, as shown in FIG. **15**. A secondary guide **127**, such as depicted in FIG. **18** is provided for each level and running length of stranded material carried by the magazine frame **121**. In the embodiment illustrated in FIGS. **12-15**, a single running length of stranded material is supplied to the manufacturing process for every level of packages **30** carried by the associated carts **140**. From the secondary guides **127** located at the lateral aspect of the magazine frame **121**, the running lengths are routed vertically to a guide board **12**, such as that depicted in FIG. **17**, mounted at the top of the magazine frame **121**.

According to this embodiment, a continuous supply of stranded material can be fed to the manufacturing process by the combination of a plurality of magazines **120** and associated carts **140** in a manner depicted in FIGS. **16**A and **16**B. Note that dashed lines **100**, **200**, **300** and **400** merely indicate that the number of magazines and carts can be installed in any grouping desired, with a minimum optimum configuration of one magazine **120** and two carts **140** to serve the magazine. In the embodiment of the invention shown in FIG. **16**A, in the first grouping the three magazine frames **301**, **302**, and **303**, starting from the left side of the drawing to the dashed line **100**, are disposed in parallel on opposite sides of a yarn run alley **80**, in two banks of three magazine frames **301**A & B, **302**A & B, and **303**A & B, for a total of six magazines. These six magazines are serviced by eight magazine carts **101**A & B, **102**A & B, **103**A & B, and **104**A & B, with four carts on each side of the yarn run alley **80**. In this grouping, each magazine will route three running strands to the creel along yarn run alley **80**, thus this grouping is capable of continuously supplying up to eighteen running ends of stranded materials to the manufacturing process. In this embodiment carts **101**, **102**, **103** and **104** are parked between magazine frames **301**, **302**, and **303** such that a single cart will simultaneously supply the two magazines that are adjacent to the cart. For example, cart **103**A can simultaneously supply stranded material from opposite sides of the cart to feed magazine frames **302**A and **303**A, thus each active cart supplies six running strands simultaneously from one of the packages **30** in each row on the cart.

With each of the magazine frames routing three running lengths of stranded material, the strand count can be incrementally increased by the addition of magazine frames **121** and associated carts **140**. As shown by the system depicted in FIG. **16**, the grouping of carts **101**A & B-**105**A & B, and magazine frames **301**A & B-**304**A & B, shown to the dashed reference line **200**, up to twenty four running lengths of stranded material can be provided. In the system shown through reference line **300**, the creel magazine system can incrementally increase the strand count to thirty six strands, by the addition of carts **106**A & B and **107**A & B and magazine frames **305**A & B-**306**A & B. Similarly, in the system shown through reference line **400**, a strand count of up to forty eight running lengths can be achieved. The invention thus provides for a modular, readily configurable system **10** to supply a desired number of strand counts to a manufacturing process.

While the carts **140** and magazine frames **121** shown in FIGS. **12-14** are depicted to supply three running lengths of stranded materials, the invention contemplates that they may be modified to carry additional running lengths of stranded materials, such as by increasing their capacity for supporting additional packages **30** and guides **70** either the vertically, longitudinally or a combination of the two.

US 7,806,360 B2

11        12

As described in greater detail below, continuous running of the manufacturing process may be accomplished where the system alternates delivery of stranded materials between odd numbered carts **101**, **103**, **105**, **107**, **109** and even numbered carts **102**, **104**, **106**, **108** to supply material to the adjacent magazine frames **301-308** and thence to the manufacturing process, as shown in FIGS. **16**A and **16**B respectively. By way of example, referring to FIG. **16**A, cart **103** simultaneously supplies three running strands to frame **302** and three running strands to frame **303**. At the same time cart **105** simultaneously supplies strand to frames **304** and **305** while cart **107** supplies stranded material to frames **306** and **307**. Detailed routing of the stranded material is shown in reference to FIGS. **13** and **15**, where stranded material from an active package **30**a in each row adjacent a magazine frame **121** on the odd numbered carts is routed through the ring guide **70** dedicated to that level of the magazine frame and is routed laterally to a secondary guide **127**, shown by segments a and b, and then vertically to guide boards **12**, from which it is routed to the manufacturing process. As depicted by segment c, the trailing end of package **30**a is tied to the leading end of the stranded material on ready package **30**b, also on the same side and row of odd numbered cart, e.g. cart **103**. As shown by segment d, the trailing end of package **30**b is routed across the adjacent magazine frames **302** and **303** through transfer devices **60** and tied to the leading end of ready package **30**c carried by even numbered cart **102** and **104** respectively. Finally, as shown by segment e, the trailing end of package **30**c is tied to the leading end of ready package **30**d on cart **102** and **104** respectively.

Once the packages **30** carried by the odd numbered carts **101**, **103**, **105**, **107**, **109** have been depleted, the running ends of the stranded materials will transfer across the magazine **120**, as in the manner previously described, and begin to draw stranded material from packages **30** carried on the even numbered cartridges **102**, **104**, **106**, **108**, as shown in reference to FIG. **16**B. That is to say, carts **102** will begin supplying running strands to magazines **301** and **303**, carts **104** begins supplying running strand to magazines **303** and **304** and so on. Once delivery of the running ends has transferred to the even numbered carts **102**, **104**, **106**, **108**, the odd numbered carts **101**, **103**, **105**, **107**, **109** can be removed from the line and replaced with full or replenished packages **30**, or more preferably, the carts may be replaced by another set of carts **140** carrying full or replenished packages **30**, preferably loaded at the output of a prior manufacturing process. The leading ends of the stranded material on ready packages **30** carried by each row of the replenished odd numbered carts **101**, **103**, **105**, **107**, **109** are then tied to the tail ends of ready packages **30** of the even numbered carts **102**, **104**, **106**, **108** for subsequent transfer of delivery back to the odd numbered carts once the even numbered carts have been depleted. Thus, by alternating the feeding of stranded materials to the manufacturing process between odd and even numbered carts **140**, the system can be run continuously without the need to stop and reload packages **30** on the individual support arms **144**, thereby adding greater efficiency, and reducing the hazard of worker injury.

It will be appreciated that magazine creel system **10** does not necessarily need to supply stranded materials according to the odd even distribution described above. By way of example, the upper half, or first bank, of the system shown in FIG. **16** may feed the manufacturing process from its odd numbered carts, while the lower half, or second bank, of the system feeds the manufacturing process from its even numbered carts. Each would transfer delivery of stranded materials to their respective counterpart carts upon depletion of the packages **30** carried thereon. Thus, for ease of understanding the creel magazine system of the invention, a cart **140** that is actively supplying stranded materials to the magazine frame

**121** (or the cart that will initially deliver the stranded material) is referred to as an active cart, while a cart **140** that is carrying replenished or full packages **30** can be referred to as a ready cart. Similarly, a package **30** that is actively supplying stranded material to the magazine **120** (or the package from which stranded material is initially delivered) is referred to as an active package, while a package **30** that is not actively supplying stranded material to the magazine **120** is referred to as a ready package. While the preferred embodiments shown include pairs of packages **30** positioned on opposite sides of the magazine **120**, the contemplated invention may be practiced by transferring delivery of stranded material between single packages **30** carried on opposite sides of the magazine **120**. Thus, in the preferred embodiments of the invention a ready package may be one that is not actively supplying the manufacturing process, regardless of whether the ready package is supported on an active or ready cart.

The method of supplying stranded material to a manufacturing process by the creel magazine system **10** of the invention can also be described as feeding a running length of stranded material S to a guide **126**, **70** supported by the stationary magazine frame **121** from an active package **30** supported on at least one support arm **144** of the active cart **140**, the active cart being positioned at a first side of the magazine **120**. Sequentially transferring supply of the stranded material S upon depletion of the active package, to a ready package carried on at least one support arm **144** of the ready cart that is positioned on another side of the magazine **120**. The active package and a ready package are operatively joined by interconnecting a trailing end of the stranded material on the active package with a leading end of the stranded material on the ready package. In similar fashion, additional ready packages **30**, supported on additional support arms **144** may be included by interconnecting a trailing end of the stranded material from a preceding ready package to a leading end of the stranded material from a subsequent ready package. Greater efficiency can be achieved by the system where at least one additional ready package is carried by the active cart and the ready cart. The additional ready packages, such as in the embodiment depicted, are interposed between the active package and one of the ready package carried by the ready cart. In this manner twice the amount of stranded material may be supplied by an active cart before transferring supply of the stranded material to the ready cart.

While this invention has been described with reference to preferred embodiments thereof, it is to be understood that variations and modifications can be affected within the spirit and scope of the invention as described herein and as described in the appended claims.

I claim:

**1**. A creel magazine for feeding stranded material to a manufacturing process comprising: a magazine having a stationary magazine frame comprising a common guide for said stranded material; a first and a second removable cartridge positioned adjacent said magazine frame on respective opposite sides of said frame, said first removable cartridge having at least one support arm supporting an active package of stranded material thereon; said second removable cartridge having at least one support arm supporting a ready package of stranded material thereon; wherein a trailing end of said active package is connected to a leading end of said ready package such that said stranded material is sequentially and continuously fed to said common guide from said active package then from said ready package.

**2**. The creel magazine of claim **1**, wherein said common guide is an annular turning surface positioned to receive stranded material fed from said active package.

US 7,806,360 B2

13

**3**. The creel magazine of claim **2**, wherein said common guide further comprises an upper turning surface supported above said annular turning surface.

**4**. The creel magazine of claim **3**, wherein said annular turning surface and said upper turning surface are separated by a distance corresponding to the diameter of said packages.

**5**. A creel magazine for feeding stranded material to a manufacturing process comprising: a magazine having a stationary magazine frame comprising a common guide for said stranded material; a first and a second removable cartridge positioned adjacent said magazine frame on respective opposite sides of said magazine frame, said first removable cartridge having at least one support arm supporting an active package of stranded material thereon; said second removable cartridge having at least one support arm supporting a ready package of stranded material thereon wherein a trailing end of said stranded material carried by said active package is connected to a leading end of said stranded material carried by said ready package; wherein said common guide is an annular turning surface and said stranded material is sequentially fed to said common guide from said active package then from said ready package.

**6**. The creel magazine of claim **5**, further comprising an additional support arm supported adjacent to said at least one support arm for supporting an additional ready package on said first removable cartridge, to be selectively interposed between said active package and said ready package on said second removable cartridge to feed said stranded material.

**7**. The creel magazine of claim **5**, further comprising an additional support arm supported adjacent to said at least one support arm for supporting an additional ready package on said second removable cartridge to be selectively interposed between said active package on said first removable cartridge and said ready package on said second removable cartridge to feed said stranded material.

**8**. A creel magazine system for supplying stranded material to a manufacturing process comprising: a plurality of stationary magazine frames each comprising a guide through which said stranded material passes; a first movable cartridge and a second movable cartridge positioned adjacent at least one of said plurality of magazine frames on respective opposite sides of said at least one of said plurality of magazine frames, each said movable cartridge having at least one support arm for mounting thereon a stranded material package, such that stranded material from said stranded material package supported on said first movable cartridge is sequentially connected to stranded material from at least one other stranded material package supported on said second movable cartridge to continuously supply said stranded material to said guide.

**9**. The creel magazine system of claim **8**, wherein said guide is a ring guide defining a lower vertically opening aperture supported at substantially the same height as said at least one support arm.

**10**. The creel magazine system of claim **9**, wherein said ring guide further defines an upper aperture supported above said lower vertically opening aperture.

**11**. The creel magazine system of claim **8**, further comprising a transfer device attached to said magazine frame, wherein said transfer device releasably receives said stranded material connected between said first package and said second package.

**12**. A creel magazine system for supplying stranded material to a manufacturing process comprising: a plurality of stationary magazine frames comprising a guide through which said stranded material passes; a first movable cartridge and a second movable cartridge positioned adjacent at least

14

one of said plurality of magazine frames on respective opposite sides of said at least one of said plurality of magazine frames, each said movable cartridge having at least one support arm for mounting thereon a stranded material package, such that said package is sequentially connected to at least one other package to supply said stranded material to said guide wherein a trailing end of stranded material carried by a first stranded material package in said first movable cartridge is connected to a leading end of said stranded material carried by a second stranded material package on said second movable cartridge, such that delivery of said stranded material is continuous from said second package upon depletion of said first package.

**13**. The creel magazine system of claim **12**, wherein at least one additional package is operatively interconnected to be interposed between said first package and said second package.

**14**. A method of continuously supplying a stranded material to a manufacturing process comprising the steps of:
   a. supplying a running length of the stranded material to a creel magazine from an active package supported on at least one support arm of a removable active cart positioned at a first side of the magazine;
   b. interconnecting a trailing end of the stranded material on the active package with a leading end of stranded material on a ready package supported on at least one support arm of a removable ready cart positioned at a second side of the magazine which is opposite said first side relative to said magazine;
   c. sequentially transferring supply of the stranded material from the active package at said first side to the ready package at said second side upon depletion of the active package.

**15**. The method of claim **14**, further comprising the step of interposing at least one additional ready package between the active package and the ready package such that a leading end of the stranded material on the at least one additional ready package is connected to a trailing end of the stranded material on the active package and a trailing end of stranded material of the at least one additional ready package is connected to the leading end of stranded material on the ready package.

**16**. The method of claim **15**, wherein the at least one additional ready package is supported on a second support arm of the removable active cart.

**17**. The method of claim **16**, further comprising the step of transferring supply of the stranded material from the removable active cart across the magazine to the removable ready cart upon depletion of the packages on the removable active cart.

**18**. The method of claim **15**, wherein the at least one additional ready package is supported on an additional support arm of the ready cart.

**19**. The method of claim **14**, further comprising replacing a cart positioned at a side of said magazine having a depleted package with a replacement cart having a replenished package.

**20**. The method of claim **19**, further comprising the step of interconnecting a leading end of the stranded material from a replenished package with a trailing end of the stranded material from the active package.

**21**. The method of claim **20**, further comprising the step of interconnecting a leading end of a replenished package with a trailing end of the ready package carried by the removable active cart.

\*   \*   \*   \*   \*

## CERTIFICATE OF SERVICE

I certify that on January 9, 2015, a true and correct copy of the foregoing Principal Brief of Petitioner-Appellant was electronically filed with the Clerk of this Court using the CM/ECF System, and a copy was also sent electronically via the court's CM/ECF system to counsel for Respondent-Appellee:

Mark C. Johnson
Scott D. Smiley
The Concept Law Group, P.A.
200 South Andrews Avenue, Suite 100
Fort Lauderdale, FL 33301
Tel: 754-300-1500
Fax: 754-300-1501
Email: mjohnson@conceptlaw.com

*Attorneys for Cross-Appellant*
*Automated Creel Systems, Inc.*

By *s/ Thad C. Kodish*
    Thad C. Kodish
    Erin P. Alper
    Fish & Richardson, P.C.
    1180 Peachtree Street, N.E., 21st Floor
    Atlanta, GA  30309
    (404) 892-5005

    John A. Dragseth
    Fish & Richardson, P.C.
    3200 RBC Plaza
    60 South Sixth Street
    Minneapolis, MN  55402
    (612) 335-5070

    *Attorneys for Petitioner-Appellant*
    *Shaw Industries Group, Inc.*

## **CERTIFICATE OF COMPLIANCE**

The principal brief of Petitioner-Appellant is submitted in accordance with the type-volume limitation of Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure.  The brief contains 13,884 words, as determined by Microsoft Word.


Dated:  January 9, 2015          By *s/  Thad C. Kodish*
                                    Thad C. Kodish

                                    *Attorneys for Petitioner-Appellant*
                                    *Shaw Industries Group, Inc.*